## SEEBERGER *v.* CASTRO.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 296.  Submitted March 19, 1894.—Decided April 16, 1894.

The purchaser of an imported article in bond, pending an appeal from the assessment of duties upon it which is subsequently overruled, can, on paying the duties as assessed, maintain an action in his own name against the collector to recover an excess in the payment exacted.

*Hager* v. *Swayne*, 149 U. S. 241, distinguished.

Tobacco scrap, consisting of " clippings from the ends of cigars and pieces broken from the tobacco, of which cigars are manufactured in the process of such manufacture," " not being fit for any use in the condition in which the same are imported, and their only use being to be manufactured into cigarettes and smoking tobacco," was, under the tariff act of March 3, 1883, c. 121, subject to a duty of 30 per cent *ad valorem* as unmanufactured tobacco, and not to a duty of 40 cents per pound as manufactured tobacco.

THE defendant in error (plaintiff below) sued to recover duties which, he claimed, had been illegally exacted on certain importations of tobacco.  The case, by stipulation, was submitted without the intervention of a jury.  The court found

the facts to be as follows: The Rayner & Baxter Cigar Company imported the tobacco in question, which consisted of "clippings from the ends of cigars and pieces broken from the tobacco of which cigars are manufactured in the process of such manufacture, the said clippings and pieces not being fit for any use in the condition in which the same are imported, and their only use being to be manufactured into cigarettes and smoking tobacco." The collector assessed upon the tobacco a duty of forty cents per pound, under Rev. Stat. § 2502 as amended by the act of March 3, 1883, c. 121, 22 Stat. 488, 491, 503, which took effect on March 3, 1883, including it within the terms of the fifth paragraph of Schedule F of that act, which reads as follows: "Tobacco, manufactured, of all descriptions, and stem tobacco, not specially enumerated or provided for in this act, forty cents per pound."

The importer seasonably protested, contending that the tobacco was not dutiable under the above paragraph of Schedule F, but was so under the seventh paragraph of the same, which reads as follows: "Tobacco, unmanufactured, not specially enumerated or provided for in this act, thirty per centum ad valorem."

From an adverse ruling of the collector an appeal was duly brought to the Secretary of the Treasury. Pending this appeal, the importer sold the tobacco, in bond, to the plaintiff below, who, upon the affirmance of the collector's ruling by the Secretary, paid the duties, and in due time brought this suit to recover.

Upon the facts thus found the defendant asked the court to rule, first, that the plaintiff, as purchaser pending the decision of the Secretary, could not maintain the suit; second, that the defendant was, as a matter of law, entitled to a judgment. Reserving these questions, which were adversely decided, the defendant brought the case here.

*Mr. Assistant Attorney General Whitney* for plaintiff in error.

No appearance for defendant in error.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

That a stranger, suing solely on an assignment of a claim from those who did not see fit to prosecute it themselves, cannot recover duties averred to have been illegally assessed, is settled by *Hager* v. *Swayne*, 149 U. S. 242. That case, however, has no application to the present one because the facts of the two are different. Indeed, in *Hager* v. *Swayne*, reference was made to this case as then reported, 40 Fed. Rep. 531, and we said : " Castro had purchased the merchandise of the importer while it was in bond, and pending an appeal, and after the decision of the appeal paid the duties assessed in order to obtain possession of the property, and thereupon brought the suit, . . . the purchaser obtained an interest in the thing itself " — thus plainly distinguishing between the case of an assignment of a claim, as exemplified in *Hager* v. *Swayne*, and the case of an assignment of the thing, such as is here involved.

Whether such tobacco as that with which we are here concerned is manufactured, in the sense of the word as used in the tariff act of 1883, is a question which has given rise to some contrariety of opinion. Attorney General Brewster, on January 25, 1884, held that it was, reaching his conclusion by a comparison of the provisions of the tariff act with those of certain internal revenue laws, holding that the two were *in pari materia*, and hence that the classification of tobacco scraps as manufactured tobacco in the internal revenue laws must be taken to indicate the intention of Congress to include them under the head of manufactured tobacco in the tariff law. 16 Ops. Attys. Gen. 646. On the other hand, in *Cohn* v. *Spalding*, 24 Fed. Rep. 19, decided May 26, 1885, the Circuit Court for the Northern District of Illinois decided that scrap tobacco was not manufactured within the meaning of the tariff act of 1883. And in a still later case, which arose under the provisions of the tariff act of 1890, *Sheldon* v. *United States*, 55 Fed. Rep. 818, it was held by the Circuit Court of Appeals for the Seventh Circuit that scraps like those

now in question were manufactured tobacco within the meaning of that act, the court calling attention to the fact that these scraps had a commercial value, and were the subjects of importation in the way of business.

It seems to us, however, that both the meaning of the word "manufactured" and the analogy of the internal revenue provisions require us to hold that these scraps are not manufactured tobacco. The court below found in this case that the scraps were "clippings from the ends of cigars and pieces broken from the tobacco of which cigars are manufactured in the process of such manufacture; that said clippings and pieces are not fit for any use in the condition in which the same are imported, and that their only use is to be manufactured into cigarettes and smoking tobacco." It is thus evident that the clippings are the mere waste resulting from a process of manufacture, and not in themselves manufactured articles. In *Lawrence* v. *Allen*, 7 How. 785, 794, the process of manufacturing was defined to be "making an article either by hand or machinery into a new form, capable of being used and designed to be used in ordinary life." A like view of what constitutes an article of manufacture had been previously announced by the Court of King's Bench: "The word 'manufacture' has been generally understood to denote either a thing made which is useful for its own sake and vendable as such," etc. *Rex* v. *Wheeler*, 2 B. & Ald. 349. In *Holden* v. *Clancy*, 58 Barb. 590, the test of whether an article was manufactured is thus defined : "A manufacture is defined as the process of making anything by art, or of reducing materials into a form fit for use by the hand or by machinery; and it seems to imply a proceeding wherein the object or intention of the process is to produce the article in question. The residuum or refuse of various kinds of manufactories is more or less valuable for certain purposes, and may be, and often is, the subject of sale; but it is not expected that the skill and attention of the manufacturer is to be devoted to the quality of the refuse material. This is not the object of the process, and its quality is wholly subordinate and disregarded, when attention to it would interfere with the most profitable mode or material to

be used in the process which is the main object of the manufacturer." Tested by either of these definitions, the tobacco in question is unmanufactured. To speak of it as "partly manufactured," and deduce a contention therefrom, is simply to assume the question at issue. It is equally unsound to divide the finding of fact so as to make it designate two distinct kinds of tobacco, thus: "First, 'clippings from the ends of cigars;' and, second, 'pieces broken from the tobacco of which cigars are manufactured in the process of such manufacture.'" The words "in process of such manufacture" qualify the whole sentence.

Resort to the provisions of the internal revenue laws regarding tobacco seems to us to strengthen rather than to militate against our conclusion. Various provisions of these laws have been brought to our attention: Revised Statutes, § 3244 (ninth) and § 3368; and the act of March 1, 1879, c. 125, § 14, 20 Stat. 327, 345, providing a substitute for Rev. Stat. § 3362. These are asserted to be *in pari materia*, and to show that the tobacco in question was manufactured, within the meaning of the tariff statute, without regard to the general understanding of the word "manufacture." We think the position unsound. The internal revenue laws referred to sought to accomplish two objects: First, the taxation of all forms of manufactured tobacco, including also the waste or scrap arising therefrom; and, second, the complete accounting by the manufacturer for all the product of his factory, including the waste. As waste was necessarily embraced in both objects, it was included in the provisions of the laws relied on. A detailed examination of the statutes will accentuate these views. The first of these provisions is that of section 61 of the act of July 20, 1868, c. 186, 15 Stat. 125, 153, which reads as follows: "That upon tobacco and snuff which shall be manufactured and sold, or removed for consumption or use, there shall be assessed and collected the following taxes: . . . On all refuse, scraps, and sweepings of tobacco, a tax of sixteen cents per pound." Here is an obvious distinction taken between tobacco, etc., "manufactured and sold" on the one hand, and "refuse, scraps, and sweepings" on the other,

albeit the tax is the same on both. Its object, too, is plainly to tax tobacco of the various kinds named, in connection with their sale and removal " for consumption and use." The context of the section enforces this view. The tax is upon all tobacco manufactured, sold, or removed from the factory; and the provision as to refuse, scraps, etc., necessarily contemplates the regulation of the business of the factory, and not the grading of the tobacco.

The next section, relied upon is section 62 of the same act, which is as follows: "That . . . all manufactured tobacco shall be put up and prepared by the manufacturer for sale, or removal for sale or consumption, in packages of the following description, and in no other manner: . . . all smoking tobacco, all fine cut shorts which is passed through a riddle of thirty-six meshes to the square inch, and all refuse scraps and sweepings of tobacco, in packages containing two, four, eight and sixteen ounces each." 15 Stat. 152–3. This section evidently has the same object as the first. The fact that it directs the manner in which the scraps and refuse shall be put up in the factory affords no evidence of a legislative determination that the scraps themselves are manufactured articles. Nor does section 59 of the same act justify the interpretation which is sought to be placed upon it. On the contrary, it distinguishes scraps by fair implication from both manufactured and partially manufactured tobacco. Its language is:

" Every person whose business it is to manufacture tobacco or snuff for himself, or who shall employ others to manufacture tobacco or snuff, whether such manufacture shall be by cutting, pressing, grinding, crushing, or rubbing of any leaf or raw tobacco, or otherwise preparing raw or leaf tobacco or manufactured or partially manufactured tobacco, or snuff, or the putting up for use or consumption of scraps, waste, clippings, stems, or deposits of tobacco, resulting from any process of handling tobacco, shall be regarded as a manufacturer of tobacco."

The interpretation of this section, which would hold that scraps were manufactured tobacco, would render the provision

of the section which relates to them absolutely useless. It would be a construction which would read out of the section by necessary implication, as unnecessary, the provision as to the waste or scrap tobacco found therein. Manufactured tobacco and partially manufactured tobacco had been already provided for. The waste or clippings must have been considered neither manufactured nor partially manufactured, since they were specially provided for after the manufactured and partially manufactured tobacco had already been regulated by the terms of the section. It follows, therefore, that if, under the rule of *pari materia*, we interpret the provision of the tariff act of 1883 along with the provision of the internal revenue acts, thus quoted, we could not hold the scraps or waste to be a manufactured article, unless we said that that which is neither manufactured nor partially manufactured was yet a manufactured article. We think the context of these sections makes it clear that their general purpose and object was to regulate the manufacture and disposition of all classes of tobacco, and that they conform by a fair construction and interpretation to the view that the scraps are neither a manufactured nor a partially manufactured article. We are here dealing with the waste or the scraps not from the internal revenue point of view, but as an article of commerce, separate from the manufacturer and the factory.

The judgment below is

*Affirmed.*