## F. B. VANDEGRIFT & CO. v. UNITED STATES.

(Circuit Court, E. D. Pennsylvania.   July 28, 1908.)

No. 54.

1. CUSTOMS DUTIES—CLASSIFICATION—RAMIE SLIVER—SIMILITUDE.
  Ramie sliver is not dutiable as an unenumerated manufactured article, under Tariff Act July 24, 1897, c. 11, § 6, 30 Stat. 205 (U. S. Comp. St. 1901, p. 1693), but as cotton sliver by similitude, under section 1, Schedule I, par. 302, 30 Stat. 175 (U. S. Comp. St. 1901, p. 1655).

2. SAME — SIMILITUDE CLAUSE—PREFERENCE OVER PROVISION FOR UNENUMERATED ARTICLES.
  In a case in which the similitude clause in Tariff Act July 24, 1897, c. 11, § 7, 30 Stat. 205 (U. S. Comp. St. 1901, p. 1693), is applicable, the rate determined thereby is to be preferred to that fixed by section 6, 30 Stat. 205 (U. S. Comp. St. 1901, p. 1693), relating to unenumerated articles.

On Application for Review of a Decision by the Board of United States General Appraisers.

Curie, Smith & Maxwell (W. Wickham Smith, of counsel), for importers.

Jasper Yeates Brinton, Asst. U. S. Atty. (J. Whitaker Thompson, U. S. Atty., on the brief), for the United States.

J. B. McPHERSON, District Judge.   This is an appeal from the decision of the Board of General Appraisers classifying ramie sliver for duty under paragraph 302 of the tariff act of 1897 (Act July 24, 1897, c. 11, § 1, Schedule I, 30 Stat. 175 [U. S. Comp. St. 1901, p. 1655]) by similitude to cotton sliver.   The case has been submitted upon the decision of the board, both parties conceding the findings of fact to be correct.   The only question in dispute is the soundness of the conclusion drawn from such findings.   The opinion of the board is as follows:

"This merchandise consists of ramie fiber drawn out in the form of sliver. It was assessed for duty at the rate of 45 per cent. ad valorem under the provisions of Tariff Act July 24, 1897, c. 11, § 1, Schedule J, par. 347, 30 Stat. 182 (U. S. Comp. St. 1901, p. 1664), as a manufacture of vegetable fiber, and is claimed to be dutiable under various provisions of the tariff act, no one of which we deem applicable.

"The merchandise is in all respects the same as that the subject of G. A. 5,822 (T. D. 25,710).   At the hearing in the case a sample of the merchandise was submitted to the witnesses, and they identified the article as the same as that the subject of the decision.   We find from the record samples and testimony taken in these cases that the merchandise, the subject of these protests, consists of ramie sliver.   We hold, upon the authority and in accordance with G. A. 5,822, supra, that it is properly dutiable at the rate of 45 per cent. ad valorem, by similitude to cotton sliver, under the provisions of paragraph 302 of the said act.   Inasmuch as the right rate of duty was assessed, the decisions of the collector as to the rate and amount of duty are affirmed, and the protests are overruled."

The previous opinion (In re Albert Eckstein et al., G. A. 5,822), to which reference is made, was chiefly concerned with the position then urged by the importers, namely, that the merchandise should be classified by similitude to "flax, hackled," under paragraph 325, or to

164 F.—5

"hemp, hackled," under paragraph 327, while the only position now contended for is that it should be classified under section 6, as an article manufactured in whole or in part not otherwise provided for, and that duty should be imposed at 20 per cent. Nevertheless, the facts found in the Eckstein Case are necessary to the understanding of the present controversy, and accordingly the opinion there rendered is now quoted in full:

"This merchandise is invoiced as 'ramie,' of different colors and designations, and as 'ramie sliver.' In the vastly greater number of invoices it is designated as 'ramie sliver.' It consists of long ribbons or ropes of ramie fiber lying parallel, in lengths from a few feet to a hundred yards or more, dyed green, black, and a variety of colors, in others ecru or unbleached, and in others bleached. It was assessed for duty at the rate of 45 per cent. ad valorem as ramie roving or sliver, dutiable by similitude to cotton roving or sliver, which is specifically provided for under the provisions of paragraph 302 of the tariff act of July 24, 1897, which, in so far as pertinent, reads:

" '302. * * * Cotton * * * sliver or roving, 45 per centum ad valorem.

"A number of claims were made by protestants, but at the hearing their counsel limited his claims in the following language:

" 'The importer rests his claims on paragraph 325, for flax, hackled, and paragraph 327, for hemp, hackled, contending that ramie is one of the varieties of hemp, and, as the importations will be proven to be in hackled condition, that this paragraph 327 literally covers and provides for it; contending, further, that, if the article must be classified by similitude, its closest similitude is to either one of these two substances in paragraphs 325 and 327, and its closest of all similitudes to paragraph 325.'

"Paragraph 325 reads:

" '325. Flax, hackled, known as "dressed line," three cents per pound.'

"Paragraph 327 reads:

" '327. Hemp, and tow of hemp, twenty dollars per ton; hemp, hackled, known as "line of hemp," forty dollars per ton.'

"Another pertinent paragraph, in our opinion, is paragraph 347, which, in so far as pertinent, reads:

" '347. All manufactures of * * * ramie * * * not specially provided for in this act, 45 per centum ad valorem.'

"Much testimony was adduced at the hearing, and briefs submitted by counsel for both sides. Two questions are raised, one of fact and the other of law. First, it is contended by counsel for the importers that the merchandise is not 'sliver,' it not having progressed in the stages of manufacture to the point whereat merchandise is so known. Much stress was laid at the trial and in the briefs upon the different processes in the manufacture of various fibers whereby sliver is produced, with the purpose of supporting or rebutting the contention that this merchandise had reached that point in its manufacture known, or corresponding to what is known, as 'sliver.'

"We are of opinion that this article is ramie sliver.

"The manufacture of ramie is yet in its infancy, and machinery for that manufacture is yet imperfect. Upon the whole, from the testimony and the authorities, it unquestionably appears that the machinery best adapted for the manufacture of ramie fiber is that used for the manufacture of linen or flax. Undoubtedly ramie noils are used in cotton and woolen manufactories, but the machinery best adapted to the treatment of the ramie fiber, as an independent fiber, and its manufacture into thread or its spinning into yarns and weaving into cloth, is the flax or linen machinery.

"In determining the status in the processes of manufacture of a particular fiber, it is not necessary that it should have gone through all the processes of manufacture, or the same processes that another fiber has undergone in order to reach the same status. There are cotton slivers, wool slivers, flax slivers, ramie slivers, and slivers made from other fibers, each of which is a fiber sliver, unquestionably such, and each may have been subjected to a different number of processes of manufacture and different kinds of processes. This must unquestionably appear to be true in view of the fact that sliver

of the same fiber—for example, flax sliver—is produced by different processes and steps of manufacture. Thus we have flax sliver made from the line of flax, and flax sliver made from the tow of flax, each of which has undergone different processes of manufacture, but the product is called 'flax sliver'; so that it is not at all important in the determination whether or not a particular fiber has been brought to the status known as 'sliver' that it should have undergone certain processes of manufacture.

"In our opinion, 'sliver,' as the word implies, is a term used to express a condition of fiber. The term in its signification means something cut or divided into long, thin pieces or slivers. The importers introduced four witnesses in support of their contention that in ramie and flax manufacture the product did not become sliver until it had passed over the drawing machines. Three of these witnesses were importers of this article and parties hereto, and one a gentleman financed by one of the importers. Their testimony does not seem to be supported either by the natural signification of the word 'sliver' or by the authorities upon the subject.

"In the process of flax manufacture, sliver is produced after the flax has gone through (1) pulling of the plant; (2) rippling, which is separating the bolls from the stems; (3) retting, which is steeping or watering with a view to decomposing the gummy substance which binds together the outer membranes and the inner stalk; (4) scutching, by which the woody stalk is broken and threshed out, the long fibers called 'line flax' separated, and the short fibers called 'tow' removed; (5) hackling, a process by which the fiber is split to the finest possible condition and in which other fibers are eliminated, also called 'tow'; (6) spreading. By going through the spreading process over the spreadboard the fiber is drawn out into long ribbons or ropes, and thereby becomes 'sliver.' This sliver is reduced in fineness or size by being run through several drawing frames. The drawing frames do not make, but reduce, sliver. Sliver is made by the spreadboards. Sliver is also produced by running tow of flax through the hackling machine. In each case, it is a long ribbon, precisely similar, excepting the difference in fiber, to this merchandise, and excepting possibly in the variety of sizes of the sliver as it comes off the spreadboards.

"The witnesses adduced testified that it was sliver immediately after it left the spreadboard, and did not become such until it went through the drawing frames, and for that reason this merchandise, which they asserted had not been through the drawing frames, was not sliver. The recognized authority upon this subject, and perhaps the standard both in this country and of Europe, is the work entitled 'Posselt's Textile Library,' from volume 5 of which, at page 199, we quote the following:

"'Spreading. * * * The object of spreading is to produce a sliver out of the bunches of dressed and sorted flax, as is done in worsted spinning by means of the preparer.'

"And on page 200:

"'As previously mentioned, the bunches of flax spread on the feeding table of the spreadboard are stretched or drawn out by means of two pairs of rollers, called "feed rollers" and "delivery rollers," and are mixed in a solid, continuous sliver by means of the gills of the fallers. Out of each one of the six bunches of hackled flax fed into the spreadboard we find only a single (and proportionately thin) sliver leaving. This sliver is caught by two conductor rollers situated in front of the machine, which deliver it into cylindrical cans (sliver cans) placed in front to receive it. Each yard of sliver so delivered is measured previously to its delivery in the sliver can and registered by a simple arrangement.'

"And at page 201:

"'Before continuing the explanation of the further processes the sliver on leaving the spreading board is subjected to, we must mention another process, by means of which a sliver is also produced.'

"Here follows a description of producing sliver from tow upon a carding machine, after which the same authority continues on page 203:

"'Drawing. So far as we have explained, the production of the first sliver or foundation of the future yarn, either for the line by means of the spreadboard or for tow by means of the carding engine. The next machine which

either sliver is subjected to for the purpose of still further increasing the fineness and uniformity of the sliver is the drawing frame. Both fibers (line or tow) are from now treated by similar processes.'

"Thus it appears upon this unquestionable authority that 'sliver' is a technical designation of the condition of the fiber as soon as it is run out into long ribbons and before it goes upon the drawing frame. This perfectly comports with the natural meaning of the word. It will be noticed, in passing, that the flax line and the hemp line is the flax or hemp in the natural lengths of the fiber as they come from the field and are scutched, being but a few feet in length, the natural length of the fiber, and before they go over the spreadboard or undergo further processes which extend them into the long strings or ropes, hundreds of yards in length, in which condition it is known as sliver; that this article has undergone a process which draws it into the long ropes or ribbons, and is therefore certainly not properly comparable with line of flax or hemp line, so far as the processes of manufacture are concerned, which latter have not yet undergone these processes.

"The terms, 'dressed line,' applied to flax, and the 'line of hemp,' are misleading, for both designate bundles of flax or hemp fibers the natural lengths of such only—in no case being over a very few feet in length.

"We are, therefore, of the opinion, and find upon the question of fact here presented, that this merchandise is unquestionably, as invoiced in the great majority of cases, ramie sliver.

"The tariff act of 1897 in no place names ramie as a dutiable commodity, except as a manufacture of that fiber. In this connection it is well to observe the difference between a manufacture of ramie and ramie manufactured.

"Paragraph 347, quoted, provides for manufactures of ramie not elsewhere specially provided for. Paragraph 330 provides for threads, twines, or cords made of ramie. Paragraph 331 provides for single yarns in the gray made of ramie. Aside from these provisions none occur in the tariff act, where ramie is specifically mentioned; at least it is not mentioned otherwise than in the condition of a manufactured article.

"The first question that arises, therefore, is whether or not this merchandise falls within any of these provisions. We are of the opinion that it does not. Aside from the distinction drawn between ramie manufactured or ramie advanced in manufacture, which may be admitted for the present, it is not a manufacture of ramie. That it is not ramie thread or yarn is evident. It would seem from the decisions that it is not a manufacture of ramie. The record is clear that the uses to which these importations are devoted are for subsequent manufacture into yarn and fabrics. We think this their chief use, though incidental uses for manufacture into hat bands may also exist. In Seeberger v. Castro, 153 U. S. 32, 14 Sup. Ct. 766, 38 L. Ed. 624, the Supreme Court of the United States, in passing upon what constituted the manufacture of an article as distinguished from the article manufactured, stated (the subject of discussion being the clippings and pieces of cigars not fit for use as imported, but which were subsequently to be manufactured into cigarettes and smoking tobacco):

"'In Lawrence v. Allen, 7 How. 785, 12 L. Ed. 914, the process of manufacture was defined to be "making an article either by hand or machinery into a new form, capable of being used and designed to be used in ordinary life." A like view of what constitutes an article of manufacture has been previously announced by the Court of King's Bench. "The word 'manufacture' has been generally understood to denote * * * a thing made which is useful for its own sake and vendible as such," etc. Rex v. Wheeler, 2 B. & A. 347.'

"So in Erhardt v. Hahn, 55 Fed. 273, 5 C. C. A. 99, the United States Circuit Court of Appeals said:

"'It has been repeatedly decided under the tariff acts that where an article has been advanced through one or more processes into a completed commercial article, known and recognized in the trade by a specific and distinctive name other than the name of the material, and is put into a completed shape, designed or adapted for a particular use, it is deemed to be a manufacture.'

"Citing Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240, 30 L. Ed. 1012. In the last-cited case the Supreme Court of the United States said,

speaking of certain shells, which were held, not manufactured by reason of certain work done upon them:

" 'They had not been manufactured into a new and different article having a distinctive name, character, or use from that of the shell. The application of labor to an article, either by hand or mechanism, does not make the article necessarily a manufactured article, within the meaning of that term as used in the tariff laws. * * * Cleaning and ginning cotton does not make the resulting cotton a manufacture of cotton. * * * In Frazee v. Moffitt (C. C.) 20 Blatchf. 267, 18 Fed. 584, it was held that hay pressed in bales, ready for market, was not a manufactured article, though labor had been bestowed in cutting and drying the grass and baling the hay. In Lawrence v. Allen, 7 How. 785, 12 L. Ed. 914, it was held that India rubber shoes made in Brazil by simply allowing the sap of the India rubber tree to harden upon a mold were a manufactured article, because it was capable of use in that shape as a shoe, and had been put into a new form capable of use and designed to be used in such new form.'

"These decisions amply support the proposition that, in order to constitute a manufactured article, the processes of manufacture devoted to it must be so far completed as to render the article ready for common use, known and designated by a common name, without additional processes of manufacture. While ramie sliver may be bought and sold in the market as 'sliver,' in that form it has no common or popular use other than to be manufactured by the application of additional processes of manufacture into articles which themselves become articles of common use, such as ramie threads, ramie fabrics, ramie hat bands, and other manufactures of ramie, and is not, therefore, a manufacture of ramie. It follows that, inasmuch as there is no specific provision for ramie, or ramie advanced in manufacture, other than those mentioned in the tariff act, its dutiable status must be found within some other provisions of the act by similitude, unless it is to fall back into the classes of nonenumerated unmanufactured or manufactured articles.

"If it is similar in material, quality, texture, or use, as provided in section 7, to any other article enumerated in the tariff act, then it is dutiable by similitude to such, and these similitudes must be exhausted before resort is had to the provisions for nonenumerated unmanufactured or manufactured articles.

"The particulars of comparison in the ascertainment of similitude are enumerated in section 7, which, in so far as pertinent, reads:

" 'Sec. 7. That each and every imported article not enumerated in this act, which is similar, either in material, quality, texture, or the use to which it may be applied, to any article enumerated in this act as chargeable with duty, shall pay the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; and if any nonenumerated article equally resembles two or more enumerated articles on which different rates of duty are chargeable, there shall be levied on such nonenumerated article the same rate of duty as is chargeable on the article which it resembles, paying the highest rate of duty.'

"The importers contend that the imported articles more nearly resemble line of hemp, provided for in paragraph 327, or, if not that, then dressed line of flax, provided for in paragraph 325. The government contends that the imported article resembles in more of the statutory particulars cotton sliver or roving, provided for in paragraph 302. Much stress was laid at the hearing upon the processes of manufacture through which the various articles went in order to arrive at a condition called 'sliver.' We have already noted that in our opinion, for the purpose of comparison, the variety of processes through which the article has gone is not a safe guide, for the reason that sliver in different materials, and in fact in the same material may be produced by different processes of manufacture.

"From the standpoint of material, ramie, flax, cotton, and hemp are vegetable fibers, probably of the grass order. If there is a difference between them, as there would seem to be by their being enumerated separately in the tariff act, ramie could not be held to be similar to one more than the other in material; or, if similar to any one, it may be equally similar in material to all the others.

"In quality we find many attributes. There may be color or appearance, tensile strength, size, and possibly other immaterial particulars. It appears, from all the authorities at hand and investigation, possible that in no one of the enumerated fibers is the color the same nor the size of the fiber. It is admitted by all that the ramie fiber in tensile strength exceeds all the others. An approximation has been made on the following percentage: Ramie fiber, 100; hemp, 36; flax, 25; silk, 13; cotton, 12. In the course of comparisons, however, it must not be lost sight of that this merchandise is not in the condition of fibers, and the condition of the merchandise as imported is the subject of comparison, and not its condition at some remote period in the course of its manipulation. This article is from three to four feet to a hundred yards or more in length, and is a long rope or ribbon of numerous ramie fibers, which through some process of manipulation have been formed into this condition. None of the fibers have been interwoven or interlaced, but adhere one to the other in longitudinal form. Tensile strength, therefore, as a comparison, should be the tensile strength of the article imported, which is nil, and not the tensile strength of any particular fiber of that article compared with flax or other fibers not in the same condition. The tensile strength of all slivers, independent of the fiber of which it is composed, would be the same, and we think their size and color so variable as not to be the subjects of profitable comparison—particularly where they are dyed different colors, as these are. In texture, if texture is applicable to such material, they would be the same. Some of the secondary definitions of all the lexicographic authorities speak of texture as 'the peculiar disposition of the constituent parts of any body—its make—its consistence.' As compared with cotton sliver, or any other sliver, this sliver from that standpoint would be the same, for the arrangement of the fibers, as above described, is precisely the same.

"In use, as already stated, all slivers are the same; at least, this must be true of chief use, for they are ultimately destined to be spun into thread or woven into fabrics. There is no provision in the tariff law for flax sliver or hemp sliver. There is a provision in the tariff law for but one sliver, and that is for cotton sliver. That this is a comparable status of merchandise must be admitted from the presence of that paragraph in the tariff act, and that ramie sliver is more like cotton sliver than it is like any other different statutory status of any other fiber seems to us beyond question. In the condition imported it is a sliver, and as such must of necessity more nearly resemble the only sliver—cotton sliver—mentioned in the tariff act in all statutory particulars than any other status mentioned by Congress. We are of the opinion that the merchandise was correctly assessed."

This decision of the board was affirmed by the Circuit Court for the Southern District of New York (T. D. 26,462), and, although the ruling of the court was entered by consent, the decision has been acquiesced in during the last three years. The present proceeding is, therefore, an indirect attack upon the judgment then entered by Judge Townend, and, if successful, would result in the imposition of one rate of duty when the merchandise in question is brought into this district, and of a different rate when it is brought into the Southern District of New York. It is hardly necessary to point out the undesirability of such a result. This has already been done by the Court of Appeals for the Third Circuit in two cases (Hill v. Francklyn, T. D. 29,-074, 162 Fed. 880, and Murphy v. United States, T. D. 29,032, 162 Fed. 871), in each instance affirming the decisions of Judge Holland reported in T. D. 28,856 and T. D. 28,819, respectively. If, therefore, the ruling in Eckstein's Case is to be dissented from, I think the proper tribunal to announce such a view is the Court of Appeals, and for this reason I shall follow the formal judgment of the Circuit Court for the Southern District of New York, adding merely that, if the similitude section is applicable, the rate determined thereby is to be prefer-

red to the rate fixed by section 6. Hahn v. United States, 100 Fed. 635, 40 C. C. A. 622.

The decision of the Board of General Appraisers is affirmed.