**UNION WIRE ROPE CORPORATION v. ATCHISON, T. & S. F. RY. CO.**

No. 9468.

Circuit Court of Appeals, Eighth Circuit.

July 20, 1933.

Harry L. Donnelly, of Kansas City, Mo. (Phil D. Morelock, Perry W. Shrader, and William M. Cave, all of Kansas City, Mo., on the brief), for appellant.

Dean Wood, of Kansas City, Mo. (Cyrus Crane and George J. Mersereau, both of Kansas City, Mo., and E. E. McInnis, of Chicago, Ill., on the brief), for appellee.

Before STONE and KENYON, Circuit Judges, and REEVES, District Judge.

STONE, Circuit Judge.

This is an action by appellee for interstate freight undercharges. Of the forty-three counts, one was for a shipment of wire and the others for separate shipments of wire rope from Kansas City, Mo. From a judg-ment upon all counts, aggregating $3,024.49, defendant brings this appeal.

The sole substantial issue here is whether these shipments were entitled to be made under a stoppage in transit through rate tariff in force by the Wabash Railway Company, the initial connecting carrier. That issue arises as follows: Appellant bought steel rods at Chicago and shipped them via the Wabash to Kansas City, where it operated a wire rope factory. At Kansas City, the rods were subjected to a heating process and certain chemical treatment to prepare them for drawing into wire. Then they were, in repeated operations, drawn through dies of lessening sizes into steel wire. This wire was woven into strands which were woven about a central core of manila rope so as to form wire rope, the finished product. It is this wire and wire rope which were shipped to various interstate destinations over the line of appellee that are the subject of this action. The Wabash had in force a tariff (I. C. C. No. 6286) governing "Transit Privileges on Iron or Steel Articles." Under the subheading "Rates," this tariff provides as follows: "(a) When the unfabricated material covered by the inbound billing matched against outbound shipments originates at a point from which a joint through rate is in effect via the transit point, the rate to be charged will be the lawful through rate on the unfabricated or fabricated material, whichever is higher from origin point to final destination, in effect at the time of shipment from such origin point, plus fabrication charge of two (2) cents per 100 pounds."

In each of these shipments there was a "joint through rate" on the Wabash and appellee via "the transit point," Kansas City. It was this through rate which was paid to the appellee. This action is for the difference between the through joint rate and the local rate from Kansas City. Under the subheading "Application of Tariff" is the following: "Articles of Iron and Steel, viz.: * * * rods * * * May be Stopped at * * * Kansas City, Mo. * * * For the purpose of Reworking or assembling (called fabrication herein)." There is no dispute that the conditions of the above tariff were complied with in all except the disputed respect, which is whether what appellant did to the rods in Kansas City is "reworking," within the meaning of this tariff.

A rate tariff is in essence a statement by the carrier to possible shippers that it will furnish certain services under certain conditions for a certain price. When a tariff has

become legally promulgated, it is binding upon both the carrier and any shipper taking advantage of it, and its terms (in essence) become, in such respects, the only contract between the two allowed by law. Since the tariff is written by the carrier, all ambiguities or reasonable doubts as to its meaning must be resolved against the carrier. Not only is this simply an application of the general rule as to construction of written contracts and instruments, but, when the place occupied by transportation and the situation of shippers are considered, it is particularly useful in application to tariffs. The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed. If the tariff is addressed to a special class of shippers and uses words which have a particular or customary import among such class of shippers, that meaning should be given to such words, for that is how they reasonably would understand them. For example, if a tariff provided a lower rate upon "culls" in apple shipments, that word must find its definition in what apple shippers honestly regard and treat as "culls." When the carrier addresses a word to a class, it must abide by the established or customary meaning of that word in that class. This rule works out justice. Always the carrier can avoid such words or it can make clear the meaning it intends them to have. On the other hand, the shipper would naturally and reasonably understand the words in their customary meaning, and to hold him to something else after he had become obligated through reliance thereon would result in deception and loss caused by the carrier to its advantage.

■ The tariff involved here is addressed to a class. That class is those who work upon "Articles of Iron and Steel, viz.: Angles, Bars, Beams, Bolts, Castings, Channels, Columns, Girders, Nuts, Plates, Rivets, *Rods*, Sheets, Tees, Tubular Iron or Steel (unfabricated from rolling mills) or Zees" (italics added). The tariff tells that class what they can do with the above iron and steel articles at the transit points and retain the tariff through rate. What they can thus **do** is stated as "Reworking or assembling (called fabrication herein)." These words "Reworking or assembling" are broad and general in ordinary meaning.

Our first search is to ascertain whether the carrier has given any guide, in the tariff itself, to the meaning it intends these words to convey. A designated note (" * * * ")

to this statement of the tariff calls attention to the fact that this tariff has changed an earlier one by eliminating (as to these transit points) the words, "and there fabricated into Iron or Steel framework or sections for bridges, buildings or cars." That is, the limitation of the former tariff as to the kinds of articles to be there made is withdrawn, and the shipper is permitted to do anything reasonably included in the words "Reworking or assembling." Since these words are "called fabrication herein" (meaning the entire tariff), we examine the use of the word "fabrication" in other parts of the tariff. It is frequently used therein, but the only use pertinent to our inquiry is "Rule 25," entitled "Consolidation," which reads as follows: "The fabricator is not required to preserve the identity of unfabricated material; it may be consolidated in the fabricating plant and applied in accordance with the provision shown on page 3 against the tonnage balances of each carrier without regard to the origin of the material."

From this it appears (a) that the identity of the shipped in material need not be preserved, and (b) that such may be "consolidated in the fabricating [reworking or assembling] plant." Obviously Rule 25 suggests a broad rather than a narrowed meaning of "Reworking or assembling."

We next turn to the ordinary meaning of these two words. They are used in the disjunctive, and are properly to be taken as meaning different things. "Reworking" is the important word here, and means working again. "Working again" necessarily refers to a prior *working*. It means that the articles have been "worked" before they reach the transit point, and that the tariff allows them to be there worked again. How had these rods been worked before they reached Kansas City? The evidence shows the only working to be the manufacture at the rolling mills of the rods. That process is described as follows: "The rod is made in the open hearth furnace; the steel is poured into moulds called 'ingots.' These ingots are put in a soaping pit to become white hot throughout and are then rolled down in the blooming mill to bloom. These blooms are cut up into billets. These billets are reheated in another furnace in the rod mill and are rolled into the rods. These rods are formed into coils."

From this wording of the tariff and its application to actual conditions affecting the articles dealt with therein when initially shipped, it would appear that the shipper would

reasonably and properly understand the tariff as giving him a wide range of change and treatment of the rods at the transit point.

In this connection it is pertinent to observe that more than 90 per centum of the steel rod tonnage produced annually is made into wire and wire products (Chain Iron and Steel, etc., 151 I. C. C. 83, 86), and the general classification of iron and steel articles for rate-making purposes includes rods and wire in closely related classifications as shown in the last-cited case at page 84, where the Commission says: "In a general way iron and steel articles for rate-making purposes are separated into three groupings; first, pig iron and articles taking pig-iron ratès; second, steel billets, and articles taking billet rates, including rods, ingots, skelp, slabs, and waste materials; and third, the manufactured iron and steel list which embraces all other iron and steel articles which have progressed in manufacture beyond the billet stage, including bars, tank plates, structural shapes, wire, wire nails, wire fencing, bolts, nuts, car axles, beams, chain or link belting, corrugated or plain culverts (knocked down), locomotive frames, girders, and boiler plate. Articles in the billet list take sixth class or commodity rates slightly lower. Articles in the manufactured iron and steel list take fifth class or commodity rates slightly lower, minimum 36,-000 pounds."

The third approach to a construction of this tariff is required by the contention of appellant that "working" and "reworking" have a customary meaning in the iron and steel trade. This contention is supported by evidence tending to show that such meaning covers what appellant did here. There is no evidence to the contrary.

From what has been said, the conclusions are that the tariff is very broad and general in its definition of what may be done to the rods at the transit points; that the evidence and findings strongly tend to prove the treatment of the rods by appellant to be within the tariff whether construed in the ordinary meaning of the words as applied to the situation or in the customary meaning of the trade to which they are to be applied; that appellee has failed to sustain its burden of proof to show that such treatment was outside the tariff; and that the judgment must be reversed.

### Contentions of Appellee.

Appellee advances several contentions which merit examination.

The first is that "the trial court, by its special finding of fact, has conclusively established on this appeal that the wire and wire rope, produced by the appellant * * * was a new manufactured product of the original rods" because (a) a special finding of fact by a court, sitting as a jury, is binding if there is any substantial evidence to support it; (b) the appellant did not call the trial court's attention to appellant's objection; (c) it cannot be said, as matter of law under the evidence that the wire and wire rope is not a new manufactured product of the original rods. As to (a), the situation is that the sole issue in the case was the construction of a tariff; that the essential facts upon which that issue was to be determined were stipulated and were all found by the court (the evidence as to a trade meaning being the exception, that evidence being undisputed and the court making no specific finding thereon); that the "finding" of the court, which is here attacked, is the ultimate conclusion that what appellant did was not within the tariff as construed by the court. Obviously, whether the tariff was to be construed to cover the situation shown by the stipulated facts is a question of law and not of fact. Were this otherwise, a question of jurisdiction might arise. See Turner, Dennis & Lowry Lumber Co. v. C. M. & St. P. Ry. Co., 271 U. S. 259, 46 S. Ct. 530, 70 L. Ed. 934; Penn. R. R. Co. v. Kittaning I. & S. Mfg. Co., 253 U. S. 319, 40 S. Ct. 532, 64 L. Ed. 928; Northern Pac. Ry. Co. v. Solum, 247 U. S. 477, 38 S. Ct. 550, 62 L. Ed. 1221; Texas & Pac. Ry. Co. v. American Tie & Timber Co., 234 U. S. 138, 34 S. Ct. 885, 58 L. Ed. 1255. If the court had found the stipulated facts (without more) and applied its construction of the tariff thereto, it would have completely disposed of the issue. The facts were never in dispute. The meaning of the tariff was disputed, and that was a matter of law. As to (b), the record shows denial of requests for "findings" presented by appellant to find for it upon the stipulated facts—really a request for a conclusion of law. As to (c), it is sufficient to say that whether it can be said (as matter of law) that the wire and wire rope are "new manufactured" products from the rods is not really determinative (as treated hereinafter) of the meaning of the tariff. The essence of this appeal is to test whether the real facts found support the judgment.

Appellee advances related contentions as follows: That the Interstate Commerce Commission has ruled that tariff transit arrangements should be strictly construed, that is, that it must plainly appear that what the shipper does is permitted by the tariff; that the Commission has consistently held manu-

facturing is not within a tariff permitting fabrication, as applied to iron and steel articles; that the Commission has consistently regarded wire and wire rope as a manufactured product distinct from rods; that these holdings by the Commission are not to be disturbed except for cogent reasons.

The Commission has held that "transit rights must be specifically authorized by tariff provision; they can not be inferred." Armour & Co. v. D., L. & W. R. R. Co., 101 I. C. C. 337, 339; Swift & Co. v. C., B. & Q. R. R. Co., 50 I. C. C. 233, 234. Also see Moore Stave Co. v. Morgan's L. & T. R. & S. S. Co., 41 I. C. C. 472, 473. Such statements in the just above citations were not used in connection with ambiguous or doubtful expressions in tariffs. Of course, the authority for any charge, condition, practice, or service must be found in the tariff, and nothing not so found can be inferred or added thereto, but, where expressions in a tariff are doubtful in meaning—are ambiguous—all reasonable doubts must be resolved in favor of the shipper. United States v. Gulf Refining Co., 268 U. S. 542, 546, 45 S. Ct. 597, 69 L. Ed. 1082; Atl. C. L. R. Co. v. Atlantic Bridge Co., 57 F.(2d) 654, 655 (C. C. A. 5); Southern Pac. Co. v. Lothrop, 15 F.(2d) 486 (C. C. A. 9).

Appellee contends that the Commission has consistently held that "fabrication" does not mean or include "manufacture" as applied to iron and steel articles. The word "fabrication" in this tariff is not the controlling term. "Reworking" is the word of concern. The use of "fabrication" in the tariff is, at most, as a convenient term to include "Reworking or assembling." If such is its use, it is defined by the two words "reworking and assembling," which gets us back to the prime importance of the meaning of "reworking." However, the decisions cited fall short of giving "fabrication" a technical meaning in iron and steel article tariffs which must operate to circumscribe the meaning of that word whenever found in such tariffs. The first of these is Fabrication-in-Transit Charges, 29 I. C. C. 70, which involved an investigation into the propriety of increased charges (from 1½ to 2½ cents per hundredweight) for transit privileges concerning "structural steel to be fabricated in transit," and of changes in rules governing the same. The industry with which that decision and the tariff therein were concerned was structural steel. What "fabrication" meant in that industry was cutting the "various structural steel shapes [constituting the in shipment] to

the required length," punching, drilling, planing the ends, and riveting the structural steel together, and that trade so understood the word "fabrication." Page 73. The Commission said (page 73): "A clear distinction exists between the process by which structural steel is manufactured and the subsequent process by which it is adapted for use in bridges, buildings, and other structures. In connection with the latter, custom has established the use of the word 'fabrication' to distinguish it from the previous one of manufacture."

Parkersburg Rig & Reel Co. v. B. & O. R. Co., 63 I. C. C. 363, involved the reasonableness and prejudice of a rate according transit fabrication privileges on steel articles, including "plates" but not "sheets." Preliminary to the discussion of whether "sheets" were equivalent to "plates," the Commission described what took place at the transit point plant where steel tanks were made, and said (page 364): "Fabrication, which means bending, bolting, boring, burning, countersinking, cutting, drilling, flanging, gagging, painting, planing, punching, reaming, riveting, sawing, shearing, straightening, tapping, threading, and welding, takes place at complainant's plant. The tank material after it has undergone the process of fabrication, is shipped, in an unassembled state, to destinations where it undergoes additional fabrication, is assembled, and erected by complainant's employees."

Magor Car Corporation v. D., L. & W. R. Co., 144 I. C. C. 135, was an investigation to determine the reasonableness and equality of a tariff allowing fabrication in transit which apparently designated the articles which might be fabricated, but omitted "car trucks." In describing the shipper's process, the Commission said (page 135): "Complainant purchases most of the iron and steel parts, used in the fabrication of car trucks in and around Pittsburgh, Pa., in what is known as the Pittsburgh steel-producing district. The process of fabrication consists of cutting the material to length, punching, drilling, planing, riveting, and fitting together."

Also, in Fabrication of Iron and Steel at Chicago, Rock Island and Pacific Points, 190 I. C. C. 583, 584, the Commission describes what the shipper does in "fabricating" wire into hay bales, nails, etc., as follows: "By authority of the general designation of 'also iron or steel' respondent permits fabrication in transit of wire into hay-bale ties, barbed wire, wire nails, staples, and other wire products, based on the rates and charge just stat-

ed. The process of fabrication consists of feeding wire into machines which perform various operations, such as straightening, cutting, bending, and twisting, necessary to manufacture such commodities."

It is noted that the terms "fabricate" or "fabrication" and "manufacture" are used interchangeably in the case last above and in Chain Iron and Steel, and Bolt, Nail, Rivet, and Wire Rods in Official Classification Territory, 151 I. C. C. 83.

A companion to the contention just above is the position of appellee that the Commission has consistently regarded wire and wire rope as a manufactured product distinct from rods for rate-making purposes. We have examined every decision cited by counsel on both sides, and have been unable to find such a determination as contended for. We do find the Commission using the word "manufacture" in connection with wire, but such use is in connections not at all calling for or intended to be a careful use of words or any distinction between fabricating and manufacturing.

From the above it is evident that we are unable to find any holdings by the Commission which are persuasively binding, or even greatly helpful, to us here.

 Appellee argues that the term "fabrication," in the trade, does not include manufacture, and that what appellant does is a manufacturing process. The supporting citation is Transit on Iron and Steel Articles at Parkersburg, W. Va., 115 I. C. C. 381. That case was an investigation of proposed charges for out-of-line hauls on iron and steel articles fabricated in transit at Parkersburg. It involved no issue as to what the shipper did at Parkersburg. In its statement of the case, the Commission describes the action of the shipper as operating a plant "for the fabrication of iron and steel articles into tank, tank-tower, and derrick material," and that the tariff authorized transit privileges at Parkersburg "for the purposes usually included in the term 'fabrication' and reforwarding in an unfinished state, knocked down, to points of destination in the same direction. * * * " This record here contains undisputed evidence that what appellant did is understood by the trade to be "working" or "reworking."

Appellee argues that wire rope is a "new manufactured product of the original rods" and that "fabrication" cannot mean manufacture. The word "manufacture" is a broad general term susceptible of many applications and meanings. Like many general words, it invites uses which are definable only in connection with the immediate use. This is illustrated by a legion of cases dealing with definition of it. 38 C. J. 965–972; Anheuser-Busch Brewing Assoc. v. United States, 207 U. S. 556, 560, 28 S. Ct. 204, 52 L. Ed. 336; Allen v. Smith, 173 U. S. 389, 19 S. Ct. 446, 43 L. Ed. 741; Tide Water Oil Co. v. United States, 171 U. S. 210, 18 S. Ct. 837, 43 L. Ed. 139; Seeberger v. Castro, 153 U. S. 32, 14 S. Ct. 766, 38 L. Ed. 624; Hartranft v. Wiegmann, 121 U. S. 609, 7 S. Ct. 1240, 30 L. Ed. 1012; Lawrence v. Allen, 7 How. 785, 12 L. Ed. 914; United States v. Hathaway, 4 Wall. 404, 18 L. Ed. 395; United States v. Potts, 5 Cranch, 284, 3 L. Ed. 102; In re Tecopa Mining & Smelting Co. (D. C.) 110 F. 120; Foppes v. Magone (C. C.) 40 F. 570. Broadly, to manufacture means to make (State v. Marastoni, 85 Or. 37, 165 P. 1177, 1178; 38 C. J. 966), to process (Merrill v. Yeomans, 94 U. S. 568, 570, 572, 24 L. Ed. 235), to compose (Anheuser-Busch Brewing Assoc. v. United States, 207 U. S. 556, 562, 28 S. Ct. 204, 52 L. Ed. 336), to fabricate (Anheuser-Busch Brewing Assoc. v. United States, 207 U. S. 556, 562, 28 S. Ct. 204, 52 L. Ed. 336; Commonwealth v. Lowry-Rodgers Co., 279 Pa. 361, 123 A. 855, 856; Carlin v. Western Assur. Co., 57 Md. 515, 526, 40 Am. Rep. 440; Benedict v. Davidson County, 110 Tenn. 183, 67 S. W. 806, 808; Kohlsaat & Co. v. O'Connell, 255 Ill. 271, 99 N. E. 689; State Tax Collector v. Brown, 140 La. 928, 74 So. 253, 255; and see Bouvier's Law Dictionary and general dictionaries as to meaning of "manufacture" and of "fabricate").

From the above, it is clear that, while "manufacture" and "fabricate" have meanings and applications which may differ, yet they are often, and in their broadest sense, interchangeable in meaning, and that the definition in any particular instance must depend upon the environment of the particular use of either. We have been able to find no reason for narrowing the word "fabrication" in this tariff to exclude what appellant did here, although it would fall within some meaning of "manufacture."

In connection with the general thought of transit privileges involving manufacture, two observations seem not out of order. First, this case involves no issue of the reasonableness or equality of a transit privilege. The parties here treat the tariff arrangement as valid and dispute only as to its meaning. Therefore decisions of courts or of the Commission defining the purposes or bases of

transit privileges (such as Central R. R. Co. v. United States, 257 U. S. 247, 42 S. Ct. 80, 66 L. Ed. 217, and Leader Iron Works v. Ill. Central R. R. Co., 182 I. C. C. 17, 21), or determining the administrative policy of the Commission in allowing or denying such privileges (as Leader Iron Works Case, supra, page 22 of 182 I. C. C.), are not pertinent to our inquiry. Second, transit privileges more clearly involving a process of manufacture than this tariff have been allowed by the Commission; for example, the canning of raw citrus fruits (Jacksonville Traffic Bureau, Incorporated v. Seaboard Air Line Ry. Co., 178 I. C. C. 629) and the milling of grain into mixed feeds (Grain and Grain Products, etc., 173 I. C. C. 511) or into flour (Royal Milling Co. v. G. N. Ry. Co., 47 I. C. C. 263, 270; Missouri River-Illinois Wheat and Flour Rates, 27 I. C. C. 286).

Appellee contends that "reworking" cannot mean "manufacture," and that this is manufacture. If our conception of "reworking" (as above herein set out) is correct, this contention that reworking cannot mean manufacture is not sound.

We think the court erred in its judgment for appellee and should have entered judgment for appellant on the facts found by the court.

The judgment is reversed, and the case remanded for a new trial.