### GULF REFINING CO. v. UNITED STATES. *

(Circuit Court of Appeals, Eighth Circuit. September 11, 1922.)

No. 5899.

Carriers ☞38—Conviction for receiving concessions from carriers held not sustained by the evidence.

Conviction of defendant, a refining company, on the charge of receiving concessions from a carrier in violation of Interstate Commerce Act Feb. 19, 1903, § 1, as amended by Act June 29, 1906, § 2 (Comp. St. § 8597), by securing transportation of gasoline at less than the published rate as "unrefined naptha," *held* not sustained by the evidence, which showed by large preponderance that the product shipped could not be used as commercial gasoline without further refining, for which purpose the shipments were made to defendant's refinery, and that "unrefined naptha" correctly designated the product and "gasoline" did not; that while defendant had previously shipped the same product as gasoline, and other producers did so, that was because at the time there was no rate covering unrefined naptha, and the term "gasoline" was loosely applied to both the finished and unfinished product.

In Error to the District Court, of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied January 16, 1923.

Criminal prosecution by the United States against the Gulf Refining Company. Judgment of conviction, and defendant brings error. Reversed and remanded.

R. L. Batts, of Pittsburgh, Pa., and Frank M. Swacker, of Washington, D. C. (James B. Diggs, of Tulsa, Okl., on the brief), for plaintiff in error.

William D. Riter, Asst. Atty. Gen. (James M. Beck, Sol. Gen., of Washington, D. C., on the brief), for the United States.

Before LEWIS and KENYON, Circuit Judges, and JOHNSON, District Judge.

LEWIS, Circuit Judge. The plaintiff in error (defendant below) was convicted and fined on 99 counts of an indictment charging that it received concessions on shipments of gasoline to its refinery at Port Arthur, Texas, from Kiefer, Drumright and Jenks, Oklahoma, in violation of Section 1 of the Act of February 19, 1903 (32 Stat. 847), as amended by the Act of June 29, 1906 (34 Stat. 587, § 2 [Comp. St. § 8597]). The shipments were all made by the Gypsy Oil Company between December 2, 1916, and the early part of 1919, but the freight charges were paid by defendant, and it alleged that they were under the lawful rate, the contention being that the difference in amount between the rate on gasoline and what was paid (rate on unrefined naptha) constituted a concession. Prior and subsequent to December 2, 1916, the tariff gave a rate to Port Arthur of 33 cents per 100 on gasoline in tank cars, but on that date a rate regularly established of 19½ cents per 100 on unrefined naptha in tank cars became effective and continued throughout the time covered by all shipments in controversy. There were, then, the two rates between points of origin and destination, one on gasoline in tank cars, the other on unrefined naptha in tank cars, both listed in the tariff under the general heading: "Oils." Prior to December 2 shipments were made at the rate on gasoline, and the commodity was so designated by the shipper, thereafter the same commodity was shipped to Port Arthur at the rate on unrefined naptha, and the commodity so designated. The indictment charges that the commodity shipped was in each instance gasoline; hence the burden was on the prosecution to establish that the commodity was gasoline, —not unrefined naptha. When the trial opened it was stipulated, among other things:

"Throughout the aforesaid period (covering the shipments), and prior thereto the Gulf Oil Corporation was a corporation organized and existing under the laws of the State of New Jersey; that the Gypsy Oil Company was a corporation under the laws of the State of Oklahoma; that the Gulf Refining Company was a corporation organized and existing under the laws of the State of Texas; that the Gulf Pipe Line Company was a corporation organized and existing under the laws of the State of Texas; and during said period all of the capital stock of the Gypsy Oil Company, Gulf Refining Company and the Gulf Pipe Line Company was owned and controlled by the Gulf Oil Corporation, except that the directors of each of the three last mentioned companies held shares in each of said companies sufficient to qualify them as directors."

We gather from the record that the Gulf Oil Corporation has its main office and conducts its principal business at Pittsburgh, Pa., that

the Gulf Refining Company owns and operates an oil refining plant at Port Arthur, that the Gulf Pipe Line Company is a carrying company owning a pipe line from the Oklahoma oil fields to the defendant's refinery at Port Arthur, through which crude oil is carried to the refinery, and that the Gypsy Oil Company owns and operates at Kiefer, Drumright and Jenks what are known as casing-head compression plants, into which natural gas is conducted and its alleged gasoline content extracted in liquid form by condensation under compression.

The evidence shows that when crude oil reaches the refinery at Port Arthur it is put through the distilling process. As heat is applied the component parts known as the lighter ends vaporize first, and all of them, down to what is called the kerosene cut, when taken off and condensed into liquid form, are technically and commercially known by the generic name of naptha, which embodies gasoline, benzine and naptha. By further distillation those three may be separated, coming off in vapor in the order named for condensation, the naptha part being then designated as heavy, crude or painter's naptha. A part of this crude or painter's naptha is shipped in tank cars to the compression plants at Kiefer and Drumright. Their product, if exposed, will again become gaseous. Its vapor tension is more than ten pounds to the square inch, and there are restrictions by the Interstate Commerce Commission on its shipment on account of its dangerous character. One of the witnesses testified that if it were shipped and the dome of the tank car in which it was contained were removed at the end of the route it would all escape in the air. The crude or painter's naptha having a gravity around 54, which the defendant shipped to the casing-head compression plants, was for the purpose of mixing or blending with the product of those plants, which served two purposes; the blending reduced the vapor tension, and when that was brought below ten pounds the restrictions on shipment were not so severe, and secondly, the naptha acted as a sponge to the casing-head condensate (commonly known as casing-head gasoline) and prevented to a great extent evaporation. The blending at the two plants was in the ratio of 30 to 35% naptha to 65 to 70% casing-head gasoline. At the Jenks plant another method was pursued. Instead of blending the casing-head gasoline with the naptha the casing-head was exposed and permitted to evaporate until its most volatile parts had escaped; it was then steamed and the vapor tension thus reduced below ten pounds. This was the commodity,—blended from two plants and weathered from the other,—shipped under the "unrefined naptha" rate, but which the indictment charges to be gasoline.

Prior to December 2, 1916, the condensates of the three plants and the blended commodity of the two plants were commonly known to and spoken of as gasoline by those employed at the plants. While shipments from the three plants were moving to Port Arthur after December 2 as unrefined naptha, the same commodity was shipped from those plants to the Gulf Oil Corporation at Pittsburgh as gasoline. There was no rate on unrefined naptha to that point. The gravity of casing-head gasoline was around 85, but the blended and weathered commodities had an average gravity of 76. Gravity is said to express the ratio of densities of oil and water at given temperatures. In the

oil industry it is of some weight but not a controlling guide to determine the gasoline content, or whether the particular product is gasoline. There are many specifications for that purpose in which there are slight differences, those for aeroplane gasoline, fighting gasoline for bombing planes, gasoline that meets the different tests of different States, etc. All of them give an approximate overpoint, that is, the degree of heat when vaporization begins, and the degree of heat known as the dry point, when vaporization is complete. The uniform requirement is the per cent. of recovery. The distillates must equal 95% or more of the gasoline put through the still on a test. Out of 100 gallons at least 95 gallons must be recovered. The highest recovery gotten from the blended and weathered products shipped to Port Arthur was 88%, and it went as low as 76%. Crude naptha is a part of the oil off the crude oil as far down as the kerosene cut. The first thing that the defendant does at its refinery is to put the oil in the crude still, and naptha therefrom is the first cut. It is then pumped away to tanks and agitators, and is given a sulphuric acid treatment to remove the impurities. It is known as the naptha fraction and contains gasoline, benzine and naptha. It then goes to the steaming still for the purpose of making various cuts out of it. Gasoline is the lightest of the three and comes over first, benzine the intermediate, and naptha the remainder and heaviest cut. Naptha applies to all of them as a body. After the division into gasoline, benzine and naptha the gasoline is given further treatment, and if it does not meet specifications it is necessary to blend it with other refinery products of lower or higher volatility, and sometimes with both. None of the commodity received from Oklahoma and here in question was ever shipped out from defendant's refinery in the condition in which it was received. It was testified that that would be criminally negligent, that it was not fit to be put on the market, too volatile and dangerous, that it had to be refined when it got to Port Arthur by further blending with the still products. A very high gravity gasoline is made at the refinery in the distillation of crude oil, which also is never shipped as gasoline because dangerous, and because it would not meet any specifications for gasoline, and this is always used at the refinery for blending with the commodity that comes from Oklahoma. The commodity as finally treated and blended at Port Arthur and shipped from there to the market as gasoline contains not more than 25% and as low as 5% of what was received from Oklahoma, shipped as unrefined naptha. The remaining 75 to 95% consists of refinery gasoline and painter's naptha, obtained through distillation from the crude oil at Port Arthur. The blending process frequently has to be done the second time. Distillation tests must be made to meet specifications. Compressed air is turned into the tank for thorough mixing, so as to get the distillation tests accurately. The unrefined naptha shipped from Oklahoma has various names among employés at the refinery, such as Kiefer gas, and others. Employés and managers of other casing-head compression plants in Oklahoma testified over defendant's objection as to the products of their plants, that they blended with naptha in various proportions and shipped out the blended commodities to points other than Port Arthur as gasoline, and that one plant shipped its blend to the Texas Company at

Port Arthur as gasoline. At some of them the blends ran as high as 75% of naptha, some 50%. There was great diversity in the character and quantity of the material used in blending among the casing-head producers, some used naptha, some kerosene, some fuel oil. The blending would run from 25% to 95% of material other than the casing-head gasoline, and would then be shipped out from these other plants as gasoline. Some of them did not blend but "weathered" (exposed so the lighter ends evaporated) their product below ten pounds pressure, and then shipped the residue as gasoline. Of the blended commodity at Kiefer there was shipped out of the same tank one car designated as gasoline, destined to the Gulf Oil Corporation at Pittsburgh, Pa., and another designated as unrefined naptha to the defendant at Port Arthur. The defendant's traffic agent originally asked the carriers for a transit rate on gasoline, that is, he represented that the commodity was to be moved from Oklahoma points to Port Arthur for further handling. He said he wished to move a quantity of low grade naptha at Port Arthur to Oklahoma points, work it through the plants there, and move it back to Port Arthur and rework it again before it could be put on the market. There was an arrangement of that kind in Toledo, Findlay and Lima, Ohio. That request was not granted by the carriers. He then asked that they publish a rate on unfinished naptha from Oklahoma points to Port Arthur. In that connection the railroads considered the decision of the Interstate Commerce Commission in National Refining Co. v. M. K. & T. Ry. Co. et al., (23 Interst. Com. Com'n R. 527), decided May 7, 1912, in which reparation was awarded. The shipments were from Oklahoma points to the complainant's refinery at Coffeyville, Kansas. The carrier charged the rate on refined oil. The Commission, in awarding reparation, said that the product seemed to have no distinct commercial designation or trade name, that complainant referred to it as "crude product"; one of the shippers described it in bills of lading as "crude benzine." It was obtained from the crude oil by a skimming process, by which the lighter ends of the oil were extracted and the residue marketed as fuel oil. The skimming process was accomplished by distillation carried just far enough to separate the lighter from the heavier oil, the former amounting to about one-fourth part. The Commission held that inasmuch as there was no trade name or commercial designation for the commodity, that they would leave its description to the carrier in the new rate. Attention of the carriers was also called to the fact that one of the connecting carriers had made a rate from Oklahoma points to Baton Rouge on a commodity obtained from crude oil in the same way as in the National Refining Company case, designated as unrefined naptha. The defendant's agent in the light of the foregoing facts asked for a rate on "unfinished naptha," but the carriers made a rate on the commodity under consideration as "unrefined naptha." It was testified that the commodity that moved to Baton Rouge was from a skimming plant, and that the naptha fractions down to kerosene, called the tops off of crude oil, were shipped to Baton Rouge. It and the commodity that went to Coffeyville had no substantial difference from the commodity now under consideration, except they contained no casing-head gasoline. It was shown, and the fact emphasized by the prosecution, that some

of the Gulf Refining Company records which showed the receipt of the commodity at Port Arthur in the early part of 1917 described it as "Kiefer gasoline," and that the word gasoline in many instances had been erased and that the books were in that condition when they were presented to the grand jury. It was not shown who kept the books, nor who made the erasures. It was also shown that the heading on a number of pages listing shipments of the commodity from Oklahoma to Pittsburgh had been cut off, but that letters written to the Pittsburgh office in connection therewith referred to some of the shipments as Kiefer gasoline. These erasures and changes were characterized as admissions and introduced as such. None of the blended or weathered commodity was ever marketed by defendant in the condition in which it was received, as gasoline or otherwise; samples of it were taken and tested on receipt as guides to proper blending with refinery products in making gasoline, losses were much less in the blending process than in distillation at the refinery and the cost was less, and when that could be done it was the method adopted. In rare instances the distillation process had to be used but that was usually on account of the fact of the company being in straitened circumstances for certain material, and occasionally a car would be badly off color. Blending is the general practice not only as to the making of gasoline but kerosene, lubricating and other oils. A refinery could not be economically conducted without blending, and it is the general practice at refineries. Not over ten or 12 per cent. of the casing-head condensate entered into the final blend at the refinery of the finished gasoline product that was shipped out as such. It ran as low as 5%. It was shipped to Port Arthur to blend with other material. The process is carried on under the direction of skilful men and requires years of experience.

Mr. Taber, vice-president of the Gulf Oil Corporation and a resident of Pittsburgh, had been in the petroleum business constantly since 1882. He started the Gypsy Company's compression plant at Kiefer, and had been in general supervision of it ever since. He had read extensively all treatises and literature that could be had on the oil industry. He had originated and given names to many petroleum products. He read critically on request Bacon and Hamor's book entitled, "American Petroleum Industry" before its publication. It is considered a standard work on the subject and is widely used. He had also revised the manuscript of another text-book on the subject, limited to the refining practice. He had just recently reviewed the manuscript of a book by Hamor and Padgett on the "Evolution of Petroleum and Natural Gas." He had written a good many technical papers on the subject and was a member of societies interested in the study of the petroleum industry. From the beginning it was customary to call the condensed portion of the vapor down to that used for making kerosene or lamp oil, naptha. That is the generic name applied to the whole product that comes over above the kerosene cut. The U. S. Census Report for 1885 stated that from 100 bbls. of crude oil 15 bbls. of naptha could be made, and that out of the 15 bbls. about a half-barrel was made into gasoline, the remainder of the 15 bbls. was called naptha. But later automobiles came so fast and there was such a demand for gasoline that it was necessary to go to the naptha to get something

heavier. It was necessary to make the carburetors so they would burn the heavy material, and finally the whole naptha product was utilized and prepared and called gasoline. The demand became so great that some kerosene was put in it, and again the carburetors were changed to burn heavier and heavier material, but they still called it gasoline. The automobile business has run away with the petroleum business. People in the crude oil business attempted to keep up with the automobile requirements. In distillation the parts that come off first down to kerosene are called naptha fractions; that is the generic or family name for them. At present gasoline is known as a combination of products of naptha produced from crude oil and made suitable for use in the general run of automobiles which use suction carburetors; not material that will run one make of car but many makes of cars equipped with the ordinary suction carburetor. He was familiar with the product at Kiefer, Drumright and Jenks, does not consider it gasoline but naptha. It will not fulfill any specifications for gasoline; it requires refining to fit it for the market. The Gypsy Company, when it started in business, attempted to market its product direct to customers in the northwest and failed. All sorts of blends with casing-head gasoline are made. Some blend with kerosene, some with heavy naptha. In order to make a gasoline it is necessary to make a different blend than the one used at Drumright and Kiefer. If weathered enough it could be used to run a car, but that process would take off about 70% of it. It might have to be weathered to less than 30% to run a car satisfactorily. The weathering made at Jenks and the blending at Kiefer and Drumright was to prevent excessive evaporation and reduce vapor tension. It has too much light end. In the refinery business anything which improves the quality of the oil or petroleum produced and fits it for market is considered refining. Blending is a refining process. Casing-head gasoline has too much light end for safety and for use economically. There is excessive loss by evaporation. In the ordinary specification for gasoline you must get back 95% of what you start with. From the unrefined naptha shipped from Kiefer, Drumright and Jenks you would not get back over 88% possibly 80%. Under the specifications of the U. S. Government if you do not have 95% of what you started with it is rejected and refused. You have to make the product comply with that requirement, and the only way to do it is to take off the light end. Different States require different specifications which have to be met. Unrefined naptha is a proper designation for the commodity in question.

Col. Burrell, holds degree of chemical engineer from Ohio University and Doctor of Science from Wesleyan University; was in the employ of the U. S. Bureau of Mines from 1906 to 1916; 1917 was with the U. S. Army, in charge of chemical warfare service, research division, which had to do with the development of all sorts of gases, etc. There were about 1,500 technical men in the division and he was at the head. He first discovered the method of finding the real composition of casing-head natural gas. It was known to be a mixture of paraffin hydrocarbons but it was not known what they were and in what quantities. He has written various publications, bulletins, magazine articles and technical papers on gasoline, also wrote a book on the

subject; belongs to a number of societies engaged in technical research; is familiar with the literature on the subject; is engaged in the operation of an experimental refinery; has built several refineries. He considers blending a refining process, requiring skill and experience to perform it. Many casing-head plants started compression about 1912. Until the art of blending casing-head gasoline with heavier refinery distillates was perfected the product was almost a drug on the market. That made a tremendous amount of natural gas gasoline available for use as automobile fuel. Naptha is the light distillates which come off from crude oil down to the kerosene cut. It is a generic name. He defines gasoline as an inflammable liquid, a mixture of hydrocarbons suitable for use in any kind of vaporizers. There is a great deal of confusion in the nomenclature of the petroleum industry. The material shipped from Kiefer, Drumright and Jenks is not gasoline, although it is popularly called gasoline. The name unrefined naptha is a proper and appropriate description of the material. Gasoline is a wrong name for it. It would be just as appropriate to apply it to the topping or skimming plant material (shipped to Baton Rouge) described by the Carter Oil man. Casing-head gasoline is not usable in an automobile; it is too volatile and vaporizes too rapidly, and there is great loss on distillation. Most gasolines would not lose over 2 to $2\frac{1}{2}\%$ on distillation test.

Dr. Garner, mechanical engineer; Pittsburgh; of recent years engaged principally in reference to natural gas gasoline recovery; has university degree; now in Mellon Institute of Industrial Research at Pittsburgh. Gasoline in the strict sense is that low boiling portion of naptha having a gravity from 76 to 82 and usable for the purpose of illumination. It is also used as a term applicable to products of petroleum to be used for vaporization purposes. It is a product of the naptha fractions of crude oil. Used as a commercial term or article of commerce, it is not considered gasoline unless it can be used for vaporization purposes, such as running a car or gasoline stove. The product shipped from Kiefer, Drumright and Jenks to Port Arthur is not gasoline in any proper sense of that word. Unrefined naptha describes that commodity very accurately. About 96% of all the material used and called gasoline is used in internal combustion engines with suction carburetors. Practically all of them are blended.

Dr. Schock, Chairman School of Chemistry and Mechanical Engineering, University of Texas. In defining gasoline we must consider its use and take that as the basis for a definition. It is most used in the ordinary automobile. It is primarily obtained from petroleum. What we use to-day and call gasoline is not identical with the material that was called gasoline years ago; it was more volatile than the present gasoline. It is a liquid, volatile, inflammable, but so made up, and is a mixture of a number of substances in such proportions, that a part only will volatilize when air is blown through it, as is done in the ordinary automobile carburetor. The amount thus changed to strict gaseous form must not be very large. There is a degree of interchangeability between the words gasoline and naptha, but it is a little one-sided. All gasoline can be called naptha, that is, it is a product of naptha. The word gasoline designates the naptha of certain properties, whereas the word naptha designates any volatile inflammable liquid hy-

drocarbon mixture. He was familiar with the product shipped from Kiefer, Drumright and Jenks to Port Arthur, it is not gasoline, it is appropriately described as unrefined naptha. The words unrefined naptha would also embrace such material as a topping or skimming plant produces. A material that will begin to distill at least as low as 140 deg. F., that will distill 20% at least at 221, that will distill 45% at 275, that will distill at least 90% at 366, and dry point not exceeding 428, and a minimum recovery of 95%, will run a car. The initial boiling point might be as low as 100. Gasoline that will run a car must be made up with a mixture of substances which will give a rather continuous course, extending from the lowest to the highest, in order that the mixture, when it is sucked or drawn through a carburetor, may partly change to a gas and the remainder be drawn along in a fine mist. By using a mixture of lubricating oils and casing-head gasoline any gravity may be obtained, and as it is used in the car, drawn through air we would get vapor only and a very light mist because the lubricating oil would be too heavy to be drawn along. Gravity is not a guide.

Witness Miller, a petroleum refiner and consulting engineer, for a while manager of the refining department of Cosden & Co., handled millons of gallons of casing-head products from compression plants; is familiar with still-gas produced by the distilling process at refineries. If it is not condensed into a liquid by the compression or other process, as may be done, it escapes into the air; if condensed it is to a certain extent analogous to casing-head gasoline. It is not a finished product, it must be blended or weathered. Is familiar with the material shipped from Kiefer, Drumright and Jenks to Port Arthur; it is not suitable for gasoline and he does not consider it gasoline. Gasoline is that fraction of crude petroleum lying within the range of boiling points and other necessary points which will satisfactorily and economically operate an internal combustion motor. This material will not do that; it must be blended with products of crude oil in such proportions as to bring the material to the point where it will operate an internal combustion motor satisfactorily and economically, and blending is the most economical method of bringing it to that point. It can be done by excessive weathering or by distillation, but the weathering required for that purpose would result in a loss of 60 to 75% of the original amount. The percentage of casing-head in the final blending should be kept down to 3 to 5% of the total mixture, according to his experience, both with Pierce Oil Company and Cosden refinery. There are few refineries that use more than 10% of the casing-head product. Naptha is a generic term which describes that fraction obtained by the distillation of crude oil before the product kerosene is reached. The process of blending is a process of refining. The material shipped from Kiefer, Drumright and Jenks to Port Arthur is properly designated by the name of unrefined naptha. It might also be appropriately called unfinished naptha or unfinished gasoline blend, or unrefined casing-head blend, or unfinished casing-head blend. Unrefined naptha will embrace any naptha which is not ready for use, not completely refined; it will embrace materials referred to as tops. It would not be possible in this day for a refinery in the production of gasoline to operate successfully without blending as part of its process. There is great confusion and

misuse of names. The names of the finished product are frequently applied to the materials which ultimately become such product. It is not a practical thing to blend casing-head at the plant to a finished marketable condition, to do that you would have to bring to the casing-head plant 90 to 95% of other refinery products, or locate the refinery at the casing-head plant, and as the well was exhausted move the refinery. Blending is for the initial point, for end points, for gravity; not for one point but anywhere from 5 to 14 points, including various distillation points in the curve, also to meet the various specifications, and it requires considerable experience and an intimate knowledge of the products used.

Dr. Bacon, chemist, holds Master and Doctor degrees; in government service until 1911; since then in the Industrial Research Department University of Pittsburgh, now Mellon Institute; was Colonel on General Pershing's staff in France and in charge of chemical work for one year; member of technical societies. One of the authors of Bacon and Hamor on American Petroleum Industry. Has written a large number of papers for scientific journals; made a large number of tests of various kinds of petroleum products; his studies have embraced casing-head gasoline. The material now sold as gasoline was not manufactured prior to the advent of the automobile. Crude oil was then run into other products. The material shipped from Kiefer, Drumright and Jenks to Port Arthur is not gasoline. Gasoline is a mixture of combustible liquids, a finished product that will satisfactorily run a motor car. The automobile industry has dominated the petroleum industry so that demand for oil has been almost entirely in the direction of gasoline; 90 to 95% of it is used for running automobiles. Naptha fractions of petroleum include all fractions from the beginning up to illuminating oil. Gasoline now contains portions of the crude heavier than the naptha fractions were a few years ago. In the early days when kerosene or lamp oil was wanted the naptha fractions were exceedingly narrow, but now they are made as wide as can be. The term gasoline is loosely applied to the material from which the finished product is to be produced. We speak about boiling point. Baumé gravity and distillation curves; that is one way to look at these things and state that it is a satisfactory gasoline; but the thing behind all this is the actual work. We try it in an engine, and if we find it performs satisfactorily it is gasoline; then we make these boiling points and Baumé gravity, etc. We have a gasoline engine in the Mellon Institute which is connected up with an apparatus to register the power it develops. Have tested on that machine a very large number of gasoline materials. Then we make gravities and initial points and end points and get the curve of the gasoline, which we know is good gasoline because we worked it out in the engine; then if we get a new gasoline we could probably tell from its boiling points and its curve as to whether it also would be satisfactory gasoline. The thing we do is done in all scientific institutions. We not only test the gasoline in the engine where we can measure the horsepower but we get several different kinds of cars and drive them over the roads near Pittsburgh and see how they perform. I have tested the material commonly called casing-head gasoline; it did not make the engine run at all. Once in awhile you get one that will make the

engine run in very unsatisfactory manner. It has very little power and the consumption will be very high; it will spit and misfire, and things of that kind. Dr. Garner and he made distillation curves of this casing-head gasoline and of this blended product, and they indicate that neither would run a car; they are not gasoline. Naptha is a term used for any low boiling product of petroleum which boils below the illuminating oil fraction. The blending process is a part of refining. Casing-head can be weathered down to a point where it would run a motor car, but not in a way very satisfactory. It was shown that Bacon and Hamor used the term unrefined naptha, and a Government publication on the chemical properties of California petroleum issued in 1914 uses that term, the term comprehends casing-head gasoline. The witnesses Burrell, Bacon, Garner, and Schock all participated in testing casing-head gasoline and the blended product at the Jenks and Kiefer plants on Packard and Dodge motor cars during the trial, and all testified that the experiments were failures.

The prosecution then called W. P. Dykema, graduate Michigan College of Mines in 1905, mining engineering from 1905 to 1909, then did surveying and general engineering in the California oil fields, then returned to silver and copper mining, then in the city engineer's office of Los Angeles until August, 1915, then employed by U. S. Bureau of Mines until March, 1920, and now consulting petroleum engineer; devoted most of his time since 1915 to study of casing-head gasoline, visited plants throughout the country, has written government bulletins on compression and refrigeration of natural gas, published by the Bureau of Mines, petroleum division. Any liquid made from natural gas by compression would in his opinion run a car, that even the lightest product would be good motor fuel; had ridden in cars run by gasoline from compression plants; does not consider compression a refining process; thinks the product was already refined because it needs no purification. It is commonly known as gasoline in the trade and scientific world; never heard it called unrefined naptha before, that name is not appropriate; it is misleading in that it would need further refining and purification; it is fit for use as it is and is marketable as it is. The process of blending is not refining; it might be termed a finishing process. He defines gasoline as the lighter petroleum distillates fit for use in an automobile. Said it was not dangerous in the hands of anyone who could use it with reasonable caution, but more dangerous than curb gasoline and would not give equal power per gallon. The fractions, including gasoline, have for a long time been called by the generic name of naptha. Naptha embraces all gasoline. Naptha fractions, after they have been separated in distillation, can be properly called unrefined naptha; they are the light ends of petroleum which need further refining. Part of it is then cut out for gasoline fractions. Refineries are large purchasers of raw casing-head and blended casing-head gasoline. He did not know what they did with it. The attention of this witness was then called to the bulletin of which he was the author, published by the U. S. Bureau of Mines in 1918, entitled, "Recovery of Gasoline from Natural Gas by Compression and Refrigeration," and this excerpt therefrom seems to nullify his testimony that casing-head gasoline is a good or suitable motor fuel:

"Condensate produced by compression is also an undesirable fuel for gasoline engines. It is exceedingly volatile, which causes losses in handling, is dangerous because fumes are easily formed, and gives less power as compared with equal volumes of heavier distillates, a larger number of gallons being required to develop the same power. It gives a quick, sharp explosion in a motor cylinder, but seems to lack 'push' after the explosion has taken place."

The bulletin later on treats rather fully of the methods of blending, and among other things says:

"Some blending companies use with the usual napthas small quantities of straight still-run gasoline in order to increase the proportions of those hydrocarbons of which the naptha and the condensate contain only small percentages."

It points out that the products of different casing-head plants are different, even those in the same field; that the gases they treat are different and that each must be separately considered and studied in order to know the percentages of the various hydrocarbon fractions in the casing-head gasoline. He also participated in the test of the casing-head gasoline and of the blended commodity with two automobiles during the trial, and considered the test fairly successful as to the car in which he rode; said that he thought the trouble they did have with it could have been avoided if the carburetor had been adjusted.

Dr. De Barr, vice-president Oklahoma State University and head of Department of Chemistry, holds Bachelor and Doctor degrees; said that casing-head gasoline is not properly denominated unrefined naptha, that it is not refining to blend casing-head gasoline with naptha because both products are refined before they are put together; had used casing-head gasoline in a motor car, drove a Ford several hundred miles on compression gasoline, and a Dodge roadster a week or two with nothing but casing-head compression gasoline. The end point would need to be regulated for use by common people in its volatility, but for a man like himself it need not be regulated; that his knowledge would not entitle him to any protection with regard to volatility but the general public needs protection; he would not let his wife run it unless she learned how to use it. Its boiling points are not the proper boiling points and it is not economical motor gasoline. There is both interchangeability and confusion in the use of the names naptha and gasoline; extreme confusion as to the material more properly called gasoline. If the lighter as against the heavier hydrocarbons are too great the car will not run, and vice versa. Many writers call all of the hydrocarbons that are lighter than kerosene naptha, when derived from crude petroleum. Thinks the term unrefined naptha originated with a Bureau of Mines publication and circular, either there or with Bacon and Hamor.

Throughout the trial, during introduction of evidence and in argument, the prosecution insisted that the conduct of the defendant was fraudulent. One of the grounds of this insistence was the fact that the defendant's traffic agent asked for the rate on unrefined naptha, a commodity which had theretofore been and was then being shipped as gasoline to Port Arthur; but in the light of the ruling of the Interstate Commerce Commission in the National Refining Company case, the rate on unrefined naptha theretofore given by one of the carriers to Baton Rouge on a commodity shown to be substantially the same as

the condensate of the Gypsy Company's plants, and the testimony in this case, we think the insistence groundless and must have been highly prejudicial. Another fact relied on and pressed upon the attention of the jury was that the same commodity was shipped to Pittsburgh by the Gypsy Company as gasoline after December 2, 1916, while shipments were being made to Port Arthur as unrefined naptha and its effect upon the jury cannot be doubted, but we think this entirely without evidentiary weight in view of the further fact that there was no rate on unrefined naptha to Pittsburgh. Another error assigned is that the testimony was admitted over objection showing that the casing-head gasoline and blended product at other casing-head compression plants in Oklahoma were called gasoline and shipped as gasoline, without a showing that they were substantially similar to those of the Gypsy Company, and in the face of proof that they were not of a uniform blend with those of the Gpysy Company but contained, in some instances, as much as 75% naptha. It is also assigned as error that counsel for the prosecution stated in his argument to the jury that the Mellon Institute at Pittsburgh was founded by the Mellon family, and that Mr. Mellon is president of the Gulf Oil Corporation. The court said there was no evidence of that kind in the record. This statement could have been made for no other purpose than to prejudice the jury against Dr. Bacon and Dr. Garner, witnesses for defendant. Counsel also stated to the jury that during the time part of the shipments were made the Government was operating the railroads and that it had guaranteed the revenue of the railroads, and that the jury would have to contribute to make up any deficiency in that revenue, that the defendant, by the advantage that it got over its competitors in this way placed in its "own pocket hundreds of thousands of dollars which they were not entitled to and which the people of the United States have got to bear the burdens, and it is true that the Gulf Refining Company will have to join, thank goodness, the other people of the United States to pay these things if it had to be paid." On objection the jury was instructed to ignore the statements. All of the assignments that have been mentioned are in our judgment meritorious, the matters complained of were prejudicial and would require a reversal. Many errors are assigned, to the admission and rejection of evidence, to the instructions of the court, to the refusal of requests to instruct, and to comments by the court during the progress of the trial, which it is claimed were prejudicial and unfair. But the view we take of the case renders it unnecessary to pass on them.

It is our opinion that when all competent and relevant proof in the case is given a fair and impartial consideration the conclusion that the verdict is without support, is inevitable. The prosecution rested its case in chief on testimony of operators of casing-head compression plants that they called the condensate and their blended products gasoline, believed they were gasoline and shipped them as gasoline; and also on the claimed admissions about which we have expressed our opinion. They could not ship their products otherwise, there was no rate on unrefined naptha or unfinished naptha to their points of destination; and as to the shipments to the Texas Company at Port Arthur, on which gasoline rates had been exacted and collected, that company had

pending in the U. S. District Court for the Eastern District of Texas at the time of the trial an action for the recovery of the difference between what it had been required to pay and the rates on unrefined naptha. The defendant then called witnesses thoroughly familiar, technically and practically, with the recovery of petroleum and natural gas, their treatment, their component parts, their reduction to usable and marketable commodities, and they were in accord in their testimony that the commodities were appropriately designated as unrefined naptha, were unrefined naptha and were not gasoline, and could not be appropriately so designated. They stated the facts on which their conclusions were based. Then the best informed witnesses in behalf of the prosecution, the only ones who spoke with general information on the subject, Dr. De Barr and Mr. Dykema, were called, and both stated that casing-head condensate was too volatile and dangerous for use as gasoline,—the former as a witness and the latter in his article prepared and issued as an official bulletin by the Bureau of Mines; and neither claimed that either the condensate or the blended product would fulfill any specification for gasoline.

We think the court erred in refusing defendant's request for an instructed verdict in its favor.

Reversed and remanded.