# UNITED STATES *v.* GULF REFINING COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 40. Argued April 15, 16, 1925.—Decided June 1, 1925.

1. Under Jud. Code § 240, certiorari may be granted by this Court, at the instance of the United States, to review a judgment of the Circuit Court of Appeals reversing a judgment of conviction in a criminal case and remanding the case to the District Court for a new trial. P. 544.

2. Where a commodity shipped in interstate commerce is included in more than one tariff designation, that which is the more specific will be held applicable; and where two descriptions and tariffs are equally appropriate, the shipper is entitled to the one specifying the lower rate. P. 546.

3. Evidence reviewed and *held* to establish that the shipments in question were not " gasoline " but " naphtha ", and insufficient to prove that they were not " unrefined naphtha ", within the meaning of a railroad tariff applicable. P. 546.

4. A lower rate properly may be applied to a product shipped in an unfinished condition in the course of manufacture than that applicable to it when finished. P. 548.

5. In a prosecution of a corporation under the Elkins Act on the ground that it received concessions through shipping its petroleum product as " unrefined naphtha " and not as " gasoline ", under a tariff allowing a lower rate for the one than for the other, evidence of other and contemporaneous shipments of the same product to other places as " gasoline " under other tariffs offering no rate on " unrefined naphtha " had no tendency to prove that the product was not " unrefined naphtha " within the meaning of the tariff in question. P. 549.

6. Nor in such case, did description of the shipments as " gasoline ", in compliance with regulations made by the Interstate Commerce Commission under the Transportation of Explosives Act requiring such and similar products to be shipped as " gasoline, casinghead gasoline or casinghead naphtha ", have a tendency to prove, or amount to an admission by the defendant, that the gasoline rate was applicable or that the shipments were not " unrefined naphtha " within the meaning of the tariff, since the purpose of those regulations was to require a disclosure of the character of the shipments having regard not to rates but to the dangers to be guarded against. P. 550.

284 Fed. 90, affirmed.

CERTIORARI to a judgment of the Circuit Court of Appeals reversing a conviction under the Elkins Act and remanding the case with directions to grant a new trial.

*Mr. James A. Fowler,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States.

*Messrs. R. L. Batts* and *F. M. Swacker,* with whom
*Messrs. H. L. Stone, Jr.,* and *James B. Diggs* were on the
briefs, for respondents.

*Mr. John F. Finerty,* filed a brief as *amicus curiae,* by
special leave of Court.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Respondent was convicted in the district court for the
eastern district of Oklahoma on 99 counts, charging that
it received concessions and discrimination in rates on gaso-
line shipped by the Gypsy Oil Company between Decem-
ber 2, 1916, and March 12, 1919, from Keifer, Drumright
and Jenks, Oklahoma, to defendant's refinery at Port
Arthur, Texas, in violation of the Elkins Act of February
19, 1903, c. 708, 32 Stat. 847, as amend d by the Act of
June 29, 1906, § 2, c. 3591, 34 Stat. 584, 587. The Circuit
Court of Appeals reversed the judgment and remanded
the case with directions to grant a new trial. 284 Fed. 90.
This Court granted a writ of certiorari. § 240, Judicial
Code. 262 U. S. 738.

Defendant, insisting that this Court is without juris-
diction, made a motion to dismiss the writ. The deter-
mination of the matter was postponed to the hearing on
the merits. In *United States* v. *Dickinson,* (1909) 213
U. S. 92, it was held that certiorari could not be granted
in a criminal case at the instance of the United States.
Act of March 3, 1891, c. 517, 26 Stat. 826, 828. But that
act was modified by the Act of March 3, 1911, c. 231, 36
Stat. 1087, 1157, being § 240, Judicial Code, which is as
follows: " In any case, *civil or criminal,* in which the
judgment or decree of the circuit court of appeals is made
final by the provisions of this Title, it shall be competent
for the Supreme Court to require, by certiorari or other-
wise, *upon the petition of any party thereto,* any such case
to be certified to the Supreme Court for its review and

determination, with the same power and authority in the case as if it had been carried by appeal or writ of error to the Supreme Court." The words italicized above were added to the provisions of the Act of 1891. The phrase " upon the petition of any party thereto " is not limited by the context. The language, circumstances and history of the enactment make clear the intent of Congress to give this Court jurisdiction on the petition of the United States to bring up criminal cases on writ of certiorari. See 46 Congressional Record, pp. 2134, 4001. And the petition may be granted, notwithstanding the Circuit Court of Appeals remanded the case for a new trial and did not render a final judgment therein. *American Construction Co.* v. *Jacksonville Railway*, 148 U. S. 372, 385; *Forsyth* v. *Hammond*, 166 U. S. 506, 513. The motion to dismiss the writ is overruled.

The Circuit Court of Appeals said (p. 102) : " It is our opinion that when all competent and relevant proof in the case is given a fair and impartial consideration the conclusion that the verdict is without support, is inevitable," and held that the district court erred in denying defendant's motion that a verdict be directed in its favor. The United States asserts that this was error.

The pertinent language of the act, defining the offense charged, is as follows: ". . . It shall be unlawful for any . . . corporation . . . to solicit, accept or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier . . . whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier . . . or whereby any other advantage is given or discrimination is practiced." (34 Stat. 587.) The gist of each count is that the Gypsy Oil Company delivered gasoline to interstate carriers by

railroad at places in Oklahoma,—Keifer, Drumright and Jenks,—for transportation to Port Arthur, Texas, there to be delivered to defendant; and that defendant knowingly did accept and receive from the carriers a concession or discrimination in respect of such transportation, whereby the property was transported at a rate substantially less than the lawful rate for gasoline. It is not alleged what defendant represented the commodity to be or what, if any, tariff was applied. It was shown at the trial that all shipments referred to in the indictment were made as " unrefined naphtha", under tariffs specifying rates therefor substantially lower than the contemporaneous rates on gasoline between the same points. The rates then in force from Keifer are illustrative. They were " Oils: Petroleum Oil and its Products . . . listed under the head of ' Petroleum and Petroleum Products ' ", 39 cents per 100 pounds; " Gasoline in tank cars," 33 cents, and " Unrefined Naphtha in tank cars ", 19½ cents.

Where a commodity shipped is included in more than one tariff designation, that which is more specific will be held applicable. *U. S. Industrial Alcohol* v. *Director General,* 68 I. C. C. 389, 392; *Augusta Veneer Co.* v. *Southern Ry. Co.,* 41 I. C. C. 414, 416. And where two descriptions and tariffs are equally appropriate, the shipper is entitled to have applied the one specifying the lower rates. *Ohio Foundry Co.* v. *P., C., C. & St. L. Ry. Co.,* 19 I. C. C. 65, 67; *United Verde Copper Co.* v. *Pennsylvania Co.,* 48 I. C. C. 663. It follows that, if the property in question properly might have been described either as gasoline or as unrefined naphtha, the lower rate was lawfully applied, and defendant was not guilty. And the burden was on the United States to prove beyond a reasonable doubt that the property so shipped was gasoline and was not unrefined naphtha.

The substance of the evidence as to whether the shipments complained of were gasoline or unrefined naphtha

is given in the opinion of the Circuit Court of Appeals, and need not be repeated here. The first distillation of crude oil takes off the elements more volatile than kerosene, and these taken together are known as the " naphtha fraction ". After treatment with sulphuric acid, this fraction is divided by further distillation into three products,—gasoline, the lightest, benzine, the intermediate, and naphtha, which is called " painter's naphtha ", the heaviest. The gravity of such naphtha is around 54 degrees (Baumé). Casinghead gasoline is produced by compression of gases which come from oil wells. Like the lighter ends or elements first coming off in the distillation of crude oil, casinghead gasoline is highly volatile and dangerous to handle. Its gravity is about 88 to 90 degrees and its vapor tension is from 20 to 30 pounds to the square inch. During the period in question some of the painter's naphtha produced at defendant's refinery was shipped from Port Arthur in tank cars to the casinghead gasoline compression plants of the Gypsy Company at Keifer and Drumright, there to be blended,—about one part naphtha to two parts casinghead gasoline. The gravity of the product was about 70 to 75, and its vapor tension less than 10 pounds per square inch. At Jenks, casinghead gasoline was not so blended, but it was subjected to a treatment called " weathering ", which lowered specific gravity and reduced vapor tension to substantially the same extent as was effected by the blending with painter's naphtha. The shipment referred to in each count was casinghead gasoline so blended or weathered. Such reduction of specific gravity and vapor tension made permissible its transportation in tank cars, under the regulations of the Interstate Commerce Commission authorized by the Transportation of Explosives Act. Act of March 4, 1909, § 233, 35 Stat. 1088, 1134, amending act of May 30, 1908, § 2, c. 234, 35 Stat. 554. Regulations for the Transportation of Explosives and Other Dangerous Ar-

ticles, effective October 1, 1914, revised July 15, 1918.*
There is involved no claim on the part of the United
States that there was any violation of the act or
regulations.

The tariff on unrefined naphtha, under which the ship-
ments complained of were made, became effective Decem-
ber 2, 1916. Prior to that, the blended product was
shipped from Keifer and Drumright to defendant's re-
finery at the gasoline rate. The compression plant at
Jenks was not put in operation until after that date.
None of the products so shipped as unrefined naphtha
was sent to the market or sold to be used as gasoline. All
was used at defendant's refinery and mixed or blended
with other products to make gasoline which defendant
sold; it constituted from five to twenty-five per cent. of
such gasoline. The casinghead gasoline, before or after
such blending or weathering, did not correspond with
specifications for any gasoline sold in the market for use
as fuel for motor engines and the like. The evidence was
not sufficient to sustain a finding that the casinghead gaso-
line in question was suitable for ordinary or general use as
fuel for such engines. And, on a consideration of all the
evidence, it must be held to have been established con-
clusively that such substance was not so used and was not
reasonably suitable for such use. It follows, therefore,
that, whatever it may be called, the product was not the
familiar article of commerce sold as gasoline.

A lower rate properly may be applied to a product when
in an unfinished condition than that applicable to it when
finished. In *National Refining Company* v. *M. K. & T.
Ry.,* (1912) 23 I. C. C. 527, it was held that rates appli-
cable to refined oil were excessive when applied to carload
shipments of the so-called lighter ends of petroleum

---

* This act has since been further amended (Act of March 4, 1921,
c. 172, 41 Stat. 1444); and the Interstate Commerce Commission
prescribed regulations, effective January 1, 1923.

which had been separated from crude oil by a skimming process,—that is, by distillation sufficient to take off the more highly volatile elements,—but which was useless for commercial purposes until a further process of refinement had been undergone; and that a reasonable rate on such product was not more than two cents per hundred pounds in excess of the rates contemporaneously applicable to crude oil. Subsequent to this decision, tariffs covering "unrefined naphtha" were put in effect on the lines from Muskogee, Oklahoma, to Coffeyville, Kansas, and from Oklahoma producing points to Baton Rouge, Louisiana. The product in that case was similar to the casinghead gasoline here in question. Both included the lighter ends or more volatile elements of crude oil; they were unfinished products and differed from ordinary gasoline of commerce in like respects. Presumably, this decision and these tariffs were known to and considered by the shipper and carriers when the tariff on unrefined naphtha was published. And before that tariff was put in, defendant's representative applied by letter to the carriers for a "seventeen cent rate crude unfinished naphtha" from Port Arthur to Keifer and from Keifer to Port Arthur. The carrier's representative testified that they were requested "to put in a rate on crude naphtha or unrefined naphtha or unfinished naphtha", and that he did not recall which. The United States suggests that the shipper did not disclose to the carrier that it intended to ship the product here in question under the proposed tariff. But the evidence negatives any purpose to deceive or defraud the carriers and shows that the purpose of the carrier was to put in a tariff covering the unfinished product referred to in the negotiations as crude unfinished naphtha, crude naphtha, unrefined naphtha and unfinished naphtha.

The United States introduced evidence to show contemporaneous shipments by the Gypsy Oil Company of

such casinghead gasoline to Port Arthur billed as unrefined naphtha and to Pittsburg billed as gasoline, and also shipments by that company and others of the same product to other places, billed as gasoline. But it was not shown that the carriers had published any tariff covering unrefined naphtha to Pittsburg or the other points. In the absence of a rate on unrefined naphtha, such shipments are without significance. There was nothing to show, and no reason to presume, that all classifications had been made that could be made in respect of the numerous products of petroleum, and of those referred to in the industry as gasoline of one kind or another. There being no rate on unrefined naphtha or opportunity to choose between the gasoline rate and some other rate, shipments of the product as gasoline had no probative value or tendency to show that the product was not fairly described by and included within the phrase "unrefined naphtha" in the tariff in question.

The regulations of the Interstate Commerce Commission, revised July 15, 1918, required liquid condensates from natural gas or from casinghead gas of oil wells, alone or blended with other petroleum products, having a vapor pressure of not more than ten pounds per square inch, to be shipped as "gasoline, casinghead gasoline, or casinghead naphtha". Unrefined naphtha was not mentioned. The description of the shipments as gasoline under these regulations had no tendency to show that the tariff rate on unrefined naphtha was not applicable. The purpose of the regulations was to require a disclosure of the character of the shipment, having regard not to rates but to the dangers to be guarded against. It was not an admission on the part of the defendant that the gasoline rate was applicable or that the shipments were not unrefined naphtha within the meaning of the tariff. The language of the regulation illustrates the use of the word "naphtha" to include the casinghead product.

"Naphtha" is a generic term and embraces the lighter or more volatile parts of crude oil down to and sometimes including kerosene.  This takes in all the elements of finished gasoline.  The words "naphtha" and "gasoline" are often used interchangeably to include the unfinished product of which the gasoline of commerce is made.  The thing shipped was an unfinished product.  It was taken to Port Arthur to be used to make gasoline.  The evidence required a finding that it was naphtha.  The insistence of the United States is that it was not "unrefined".  The processes for refining crude oil in the production of gasoline include the separation and combining of various elements of the crude product, and are not limited to the elimination of impurities.  The evidence is not sufficient to sustain a finding that the making of gasoline of commerce by the use of the blended or weathered casinghead gasoline shipped to Port Arthur did not involve refining, properly so-called.  But even if the process was, as contended by the United States, a finishing and not a refining process, it is clear that the phrase "unrefined naphtha" in the tariff in question was not misleading and did not contribute to any deception or fraud.  The thing shipped was not ordinary gasoline, and it was lawful to distinguish it by tariff designation and to make the specified rate applicable.  The words employed describe the product with sufficient accuracy.  The evidence was not sufficient to sustain a finding that the shipments in question were not unrefined naphtha.

*Motion to dismiss denied*
*Judgment affirmed.*