**LOUISVILLE & N. R. CO. v. UNITED STATES.**

**Civ. A. No. 2021.**

United States District Court
W. D. Kentucky, at Louisville.

Jan. 13, 1953.

H. T. Lively, J. L. Lenihan, Louisville, Ky. (George H. Wyatt, Detroit, Mich., of counsel), for plaintiff.

Holmes Baldridge, Asst. Atty. Gen., David C. Walls, U. S. Atty., Louisville, Ky., for defendant.

SHELBOURNE, Chief Judge.

This case was tried to the Court November 29, 1951, on evidence heard at that time and on depositions taken by each side.

The action is brought under the Tucker Act, Title 28 U.S.C.A. Section 1346; the controversy revolving around whether certain motor vehicles commonly known as "jeeps" shipped by plaintiff to defendant should carry classification as a passenger automobile with a first class rating or freight automobile with a second class rating, or dumping or hauling vehicle with lug tires, and the transportation charges applicable.

Beginning in 1942 and continuing into the year 1945, plaintiff, together with certain other carriers, whose lines of railroad connect with plaintiff's lines, transported for defendant, certain motor vehicles on government bills of lading, issued by the War Department, from various points in the United States to various destination points, at freight charges set out in plaintiff's tariffs applicable to passenger motor vehicles.

Upon completion and delivery of said shipments, plaintiff as the final and delivering carrier, in accordance with the prac-

tice prescribed by the Comptroller General of the United States, submitted bills on public voucher forms for the freight charges on said shipments. Upon audit of said bills, the Comptroller General ruled that the lower rates applicable to freight automobiles should be used in the computation of these charges, and as payment had theretofore been made at the higher rate, reimbursement was effected either by deducting said differences from other bills rendered by plaintiff against defendant for transportation charges on shipments other than jeeps or by requiring plaintiff to make refunds. The plaintiff thereafter filed with the General Accounting Office of defendant supplemental bills for these amounts, for recovery of which amounts this action was brought.

The Court makes the following

## Findings of Fact

1. Plaintiff, Louisville & Nashville Railroad Company, is a corporation organized under the laws of the State of Kentucky.

2. For many years, it has been the practice of the railroads, including plaintiff, to publish "Consolidated Freight Classification" books, in which all articles are grouped in "classes", and to publish in the tariff schedules only the dollars and cents charge for transportation of each class of items— all items of each class being handled over an identical routing for the same charge. The classification of an article is indicated by the rating assigned to it. The three following classifications appeared in these books during the period in suit—

| Item | Articles | Less Carload Ratings | Carload Minimum Weight | Carload Ratings |
|------|----------|---------------------|------------------------|-----------------|
| 43735 | Vehicles, Motor | | | |
| 43740 | Automobiles | | | |
| 43780 | Freight, including tractors (driving trucks for freight vehicles or fire apparatus) loose or in packages | 1½ | 12,000 | 2-2-2 |
| 43785 | Passenger, including ambulances or hearses, loose or in packages | 1½ | 10,000 | 1-1-1 |
| 43810 | Dumping or hauling, with lug wheels, tractor lug tires, or crawler type. SU. loose or in packages | 1-1-1 | 24,000R | 40-5-A |

3. Carriers are required to publish and file with the Interstate Commerce Commission, schedules of their point to point charges for transportation—called tariffs— and the Interstate Commerce Act requires that the charges be just and reasonable. Charges are usually stated in dollars and cents per one hundred pounds. The "classification" of an article is indicated by the "rating" assigned to it.

In the three above items, "1" indicates "first class"; "2" indicates "second class", which is 85% of "first class"; "40" indicates "class forty", which is 40% of "first class"; "5" indicates "fifth class", which is 45% of "first class". In the suit involved here, this means that if jeeps are held to fall under item 43780, the charge for their

transportation in carload lots will be 85% of what plaintiff contends for on the basis of the first class carload rating in item 43785. If jeeps fall into class 43810, the charge in carload lots will be 40% of what plaintiff claims, in official and Illinois territory, 45% in Southern territory, and 45% or 50% in Western territory.

Implicit in classification must be a common quality or nature as between all items in any particular class, that common quality being that the railroad can profitably carry all items of the class for the same charge after taking into consideration all factors relating to the article and its handling. Director General of Railroads v. Viscose Co., 254 U.S. 498, 41 S.Ct. 151, 65 L.Ed. 372.

4. There is much evidence in respect to the development of the jeep by the War Department, the conception of the Chief of Infantry as to what was needed, as well as that of the Chief of Cavalry, both of whom were the moving figures in the development of the new vehicle before the Technical Committee of the War Department having jurisdiction over its development.

Around 1937, the Chief of Infantry was seeking a motor vehicle capable of going over all sorts of terrain to take the place of the horse and motorcycle in reconnaissance and liaison work. He was seeking a small, light, four-wheeled vehicle and his activities brought the Army into contact with the Bantam Car Company, Willys-Overland Company and the Ford Motor Company.

The Chief of Cavalry wanted a lightweight car to replace the expensive and cumbersome scout car in reconnaissance work and these two were active before the Technical Committee of the War Department having jurisdiction over the development of the new equipment.

Procurement of new tactical vehicles for the Army must have the approval of the Chief of Staff. General George C. Marshall, then Chief of Staff, was convinced of the necessity for the greatest possible mechanization of the Army.

5. After many experimental models and after much testing at Camp Holabird, Maryland, and modifications, the Bantam Company produced a car which was satisfactory to the Infantry and Cavalry for purposes of liason, communication, reconnaissance and command. In a letter dated October 23, 1940, to the Quartermaster General, the Chief of Infantry wrote concerning the developing jeep—

"The Chief of Infantry desires to make clear his position in regard to this vehicle. As contemplated in the Infantry it is in no sense a cargo vehicle, but is intended for reconnaissance and liason missions only, carrying a normal load of not to exceed three men, with one machine gun for anti-aircraft defense and a relatively small ammunition supply. The necessary power and sturdiness to provide adequate cross-country ability with this load is all that is required, and is all that is wanted."

From the point of view of the Cavalry, the primary purpose for which the jeep was developed was reconnaissance and it was on this basis that it was placed in the Tables of Organization and Equipment of the Cavalry. The characteristics stressed by the Cavalry were reasonable road speed, high cross-country ability, and the ability to transport four troopers, including the driver, with their normal personal arms and equipment.

The Chief of Cavalry insisted upon the vehicle having a four-wheel drive. The Quartermaster General testified that the jeep was designed primarily to hold three men and a machine gun. For further background of the jeep and its development and adoption by the Army, see Union Pacific Railroad Company v. United States, 91 F.Supp. 762, 117 Ct.Cl. 534.

6. After preliminary testing of these vehicles and making various changes, the jeep was in its final form. A contract for 16,000 jeeps was given to Willys on August 13, 1941, and for 15,000 to Ford on October 4, 1941, and these were followed by orders eventually totaling hundreds of thousands.

These contracts described the vehicles as "Trucks, ¼ ton, motor, gasoline (four wheels-four wheel drive) in accordance with U. S. Army Tentative Specification USA–LP–91–997A, dated July 7, 1941." The specifications contained the following statement of "General Requirements"—

"The trucks described in this specification are intended for use as tactical trucks by the United States Army. They will be required to transport the rated payload, which consists of military supplies, equipment and personnel, at relatively high rates of speed over all types of roads, trails, open and rolling cross country, under all conditions of weather and terrain, while at times towing a trailed load, such as a 37mm anti-tank gun, and all units and assemblies in the truck must be suitable for such use."

7. Though the evidence as a whole would indicate the jeep was originally designed and used primarily as a reconnaissance vehicle, carrying four men and a machine gun, it was also used for the carrying of cargo, towing of the 37-millimeter anti-tank gun; as a command vehicle; for evacuation of the wounded and dead from forward areas where it was difficult to get other vehicles and for bringing up supplies and rations.

It was equipped with a large radio, had a pintle integrated into the frame for towing, the specifications calling for a towed load of 1,000 pounds. Towing hooks were integrated into the front frame for hauling it out of difficulty. There were no side doors or fixed top. It was equipped with plate integrated into the frame for mounting a machine gun, full floating rear axle, four-wheel drive and a "power take-off" designed for use either while the jeep was moving or standing still. The frame was engineered to withstand shock of dropping into holes with all brakes set while towing a loaded trailer without brakes. There were no glass doors or windows and it was equipped with a cooling system to meet operating demands. The tires were designed to meet the requirement that it would operate both on hard surfaced roads and on soft surfaces, on unimproved roads or cross country, with lugs to give traction to the four driving wheels in going either forward or backward.

8. Jeeps were shipped on flat or open railroad cars, without protective covering. At times they were shipped in two tiers, with the wheels of the upper tier resting on the mud guards of the jeeps in the bottom tier.

The charges for transportation of these jeeps by the plaintiff to the points of destination were at the rates applicable to passenger automobiles, as set out in item No. 43785 "Passenger, including ambulances or hearses, loose or in packages", of the Consolidated Freight Classification Nos. 14, 15 and 16 and published tariffs on file with the Interstate Commerce Commission, and plaintiff insists that was the correct charge.

Defendant claims the lawful rating for the transportation was either that applicable to "Vehicles, Motor; Automobile, Freight—Item No. 43780 in said Classifications, or that applicable to Vehicles, Motor; Dumping or Hauling, with Lug Wheels, Tractor Lug Tires, or Crawler Type"—Item No. 43810.

9. The claim of the defendant that Item 43810 is the proper classification for jeeps is not forcefully made and the Court has little hesitancy in saying that the dumping, or hauling or lug tire characteristics of this classification do not fit the jeep.

However, the choice between Item 43780 (freight vehicles) and Item 43785 (passenger vehicles) is difficult.

It is stipulated in this case that if the applicable Item is 43785, plaintiff is entitled to recover the amount sued for and that if Item 43780 is properly applicable, then judgment is to be entered for the defendant.

The jeep was utilized for many purposes and performed capably many functions. Some involved hauling cargoes and personnel, and others carrying only personnel or cargo only. It was utilized by liason officers; as a command car; in reconnaissance; convoys for moving columns; in traffic control and supplanted the pack animal, wagons, motorcycle, and other carriers of freight and cargo.

It was, as found by the Court of Claims in the case of Union Pacific Railroad Company v. The United States, supra, [91 F. Supp. 762] a "general utility motor vehicle".

However, with all of its multiple uses, this Court agrees with the finding in the Union Pacific case that the jeep was primarily a passenger vehicle.

### Conclusions of Law

I. This Court has jurisdiction of the parties and subject matter involved herein. Title 28 U.S.C.A. Section 1346(a) (2).

II. The jeep was primarily suitable to be used and its construction permitted its use for both passenger and freight transportation.

III. Where two or more classifications appear to be equally applicable, the shipper is entitled to have applied the lower classification. United States v. Gulf Refining

468

Company, 268 U.S. 542, 45 S.Ct. 597, 69 L. Ed. 1082.

IV. The jeep was primarily designed for a passenger vehicle and comes within Classification Item 43785.

V. Plaintiff is therefore entitled to recover the amount sued for in this action.

Plaintiff will submit judgment in accordance with the foregoing findings and conclusions, upon notice to the defendant.